**Michael HARRIS, Appellant,**

v.

**UNITED STATES, Appellee.**

**No. 98–CF–1630.**

District of Columbia Court of Appeals.

Argued June 17, 2003.

Decided Oct. 23, 2003.

Corinne Beckwith, Public Defender Service, with whom James Klein, was on the brief, for appellant.

Lisa H. Schertler, Assistant United States Attorney, with whom Roscoe C. Howard, Jr., United States Attorney, and John R. Fisher and Deborah Sines, Assistant United States Attorneys, were on the brief, for appellee.

Before GLICKMAN and
WASHINGTON, Associate Judges, and
KING, Senior Judge.

GLICKMAN, Associate Judge:

Michael Harris was charged with the first degree murder of James Monroe, who was shot to death on July 28, 1995. Harris argued that he acted in self-defense. Harris claimed that James Monroe's nephew Donald Monroe had a grudge against Harris and had ordered James Monroe and another man named Thaddeus Lowe to kill Harris. Harris's first trial ended in a mistrial after the jury deadlocked; after retrial a jury convicted Harris of the lesser-included offense of voluntary manslaughter and related charges of possession of a firearm during a crime of violence and carrying a pistol without a license.

The centerpiece of Harris's self-defense theory was his allegation that James Monroe and Thaddeus Lowe had attempted to kill Harris on July 28, 1995, at Donald Monroe's urging. In confirmation of this theory, Harris claimed that Donald Monroe had tried to have him killed on another occasion by ordering Charles Minnis to shoot Harris on April 23, 1996, an attack that left Harris a paraplegic. To support his self-defense theory, Harris offered his own testimony and attempted to offer two additional pieces of evidence: an application in support of a search warrant for Donald Monroe's residence sworn to by Metropolitan Police Officer James L. Trainum and approved by an Assistant United States Attorney (hereafter "Trainum Affidavit"), which asserted that there was probable cause to believe that Donald Monroe conspired in the April 1996 attempt to murder Harris; and the testimony of Dwayne Drummond, who testified before a grand jury that he saw Donald Monroe's car drive by on the night Harris was shot. Neither piece of evidence was presented to the jury. The trial court ruled that the Trainum Affidavit was inadmissible hearsay, rejecting Harris's contention that the affidavit was a party admission by the government. When Drummond, who was under subpoena, failed to appear to testify, the trial court refused defense counsel's request to send marshals to Drummond's Baltimore residence and rejected defense counsel's alternative proposal to admit Drummond's grand jury testimony under the prior recorded testimony exception to the rule against hearsay.

We hold that the government adopted the conclusions in the Trainum Affidavit regarding probable cause when an Assistant United States Attorney signed and approved the affidavit for submission to the court with an application for a search warrant. The conclusion that probable cause existed to believe that Donald Monroe conspired to kill Harris was, therefore, an adoptive admission by a party that was admissible against the government. It was error to exclude this statement. Whether the government also adopted other statements contained in the Trainum Affidavit is a factual question that should be addressed in the first instance by the trial court on remand. We further hold that the trial court erred by failing to send marshals to secure Drummond's testimony. Because the excluded affidavit and Drummond's testimony would have been the only evidence corroborating Harris's testimony, the trial court's errors were not harmless. We, therefore, reverse Harris's convictions and remand for a new trial.

## I.

The government presented the testimony of two witnesses to James Monroe's death, only one of whom claimed to have seen the shooting. Thaddeus Lowe testified that he was with Monroe on July 28, 1995. Both men had been drinking, and Lowe testified that Monroe "looked like he had some PCP." [1] Lowe testified that James Monroe was intoxicated and "fumbling around" to the point that Lowe dropped Monroe off at his house, intending to leave him there. Later, however, Monroe approached Lowe while Lowe was making a call at a phone booth at North Capitol and R Streets, N.E. Monroe asked Lowe to take him down the block so that he could buy PCP. Lowe agreed and drove Monroe to 1st and R Streets, N.E. Monroe exited the car and approached Michael Harris, whom Lowe knew as "Jug." Lowe, still sitting in his car, saw Monroe give Harris some money and saw Harris give Monroe something in return. Lowe testified that Monroe and Harris were "talking and laughing" and that they began walking to Lowe's car. Lowe then heard Monroe challenge Harris by saying, "go head, young 'un, before I slap you" to Harris. *Id.* Lowe urged Harris to ignore Monroe's comment. Monroe began getting in the car when Harris reached behind a nearby wall, picked up a gun, and fired twice at Monroe.

Lowe testified that he drove Monroe to the hospital and left him there without speaking to the police. Lowe went to James and Donald Monroe's home, where he talked to Donald Monroe and other members of James's family before going to his own home. Lowe did not contact the police until he saw several police officers inspecting his car, at which point he approached the officers and gave a statement. Lowe's statement to the police differed in significant respects from his trial testimony. Lowe told the police that he did not give Monroe a ride, did not know why Monroe was on R Street, and did not know whether Monroe was high on PCP. Most significantly, Lowe said that Monroe was killed by a man named "Chub." Lowe explained this inconsistency at trial by claiming that he was "shaken" and meant to say "Jug."

The government also presented the testimony of Marc Queen, Harris's cousin, who testified that he was with Harris on R Street on July 28, 1995. Queen claimed that he saw Lowe and Monroe drive up the

1. The parties stipulated that James Monroe had PCP in his system at the time of his death.

street in Lowe's car and saw Monroe get out and approach Harris. Queen did not see any money or other objects exchanged between Harris and Monroe. According to Queen, Monroe and Harris argued "for a minute." Harris then walked over to Queen and asked him to get Harris's gun from his apartment. Queen initially refused but then complied with the request after Harris asked him again. Queen testified that he retrieved the gun, gave it to Harris, and walked away. Harris and Monroe continued arguing until Harris "pulled [the gun] up." Queen said he closed his eyes and did not see the shooting but "heard like three shots." The defense impeached Queen with his statements to the grand jury that Harris got the gun himself, which Queen admitted were "lies."

Several officers and forensic experts testified that James Monroe was killed by a single gunshot to the back and that one other bullet was retrieved from the door frame of Lowe's car. Detective Donald Bell testified that after Harris was arrested, he denied any involvement in the shooting and tried to place blame on Damion Nicholson, a man who Harris claimed looked just like him.

With the exception of a Howard University Hospital employee called briefly to admit medical records, Michael Harris was the only witness for the defense. Harris testified that a week before he shot James Monroe, Harris won several hundred dollars from Donald Monroe in a dice game. Donald Monroe told Harris "that I [Harris] didn't deserve his money" and punched Harris. Harris knocked Monroe down after a brief fistfight. As Harris left the scene, he heard Donald Monroe say, "I'm gonna get your ass." On July 28, 1995, Harris was hanging around on R Street when a car came up the street. James Monroe was in the car along with Thad-

deus Lowe. According to Harris, James Monroe "leaped out and started screaming and shouting at me." Monroe said that "Donald sent him down there to get his money back." Harris said he had no money. Monroe told Harris, "You think I'm playing? I'll slap a cap in your ass." Monroe started walking toward his car. Then, Harris testified, the "[n]ext thing I know I heard a shot come out [of] the car then Mark [sic] Queen handed me his gun and I closed my eyes and I shot back towards the car." Harris later clarified that Lowe was the one shooting at him. Harris testified that he fired because "I was scared for my life, I thought he was about to kill me." He denied ever selling Monroe drugs.

Harris was held in the D.C. Jail until March 17, 1996. Five weeks after his release, on April 23, 1996, Harris was shot several times by Charles Minnis and was left paralyzed. Harris testified that just before he was shot, Donald Monroe's car "rolled past" and Minnis then approached him on foot and shot him. Harris also testified that a friend named Maurice Jackson told him that Donald Monroe was driving and that Minnis emerged from the back seat of the car. (This hearsay was admitted without objection.)

The prosecutor questioned Harris's claim that Donald Monroe was involved in either shooting. She cross-examined Harris about his failure to pick Donald Monroe out of a photo array that Detective Trainum showed Harris after he was shot. The prosecutor also questioned Harris about his failure to mention Donald Monroe when Harris was first arrested for shooting James Monroe in September 1995. The government called Detective Trainum to testify in rebuttal that when he questioned Harris in the hospital, Harris identified Minnis as his assailant and had no reaction to Donald Monroe's photo.

In closing argument, the government contended that Michael Harris's claim that Donald Monroe was involved in shooting him was a recent fabrication:

What makes sense about what Michael Harris told you? What doesn't? What doesn't make sense is the first photograph in this array [shown to Harris by Trainum] is of Donnie Monroe. And Michael Harris didn't nod, he didn't put an X on the back of it, take it out and take a look. He didn't do anything with respect to Donnie Monroe. In fact, his face didn't even react to Donnie Monroe....

He didn't say a word about Donnie Monroe. So I'm asking you, ladies and gentlemen, to look when the defendant first says anything about Donnie Monroe....

I submit to you, ladies and gentlemen, that the name Damion Nicholson did not [sic] and neither does the name Donnie Monroe. Because, ladies and gentlemen, the evidence in this case is not that this cycle of violence started with some silly school yard spat over at the rec center over some craps game. The cycle of violence in this case, ladies and gentlemen, started when Michael Harris picked up a gun and shot a defenseless, unarmed man in the back like a coward.

## II.

### A.

At both his trials, Harris attempted to introduce the Trainum Affidavit as evidence supporting his self-defense theory. The Trainum Affidavit was submitted on August 27, 1996, to Superior Court Judge Dorsey in support of an application for a search warrant for the residence of Donald Monroe. The affidavit was "subscribed and sworn to" before Judge Dorsey by Detective James Trainum. Before it was submitted to the court, the affidavit was approved by an Assistant United States Attorney, as is the practice in this jurisdiction. *Cf.* 28 C.F.R. § 60.1 (2003) ("[O]nly in the very rare and emergent case is the law enforcement officer permitted to seek a search warrant without the concurrence of the appropriate U.S. Attorney's office."). On each page of the Trainum Affidavit, Clifford T. Keenan wrote the word "approved" and signed his name, identifying himself as an "AUSA."

In his affidavit, Trainum reported information evidencing that Donald Monroe paid Charles Minnis to kill Michael Harris. Trainum reported that one witness saw Donald Monroe's car drive by a few minutes before Minnis shot Harris. This witness saw Minnis driving the car. Trainum also related that several witnesses said that Donald Monroe planned to pay Minnis to kill Harris and that after Minnis was arrested, he asked Monroe to use the money to pay for an attorney. Trainum concluded that he had probable cause to believe that Donald Monroe hired Charles Minnis to kill Harris:

Based on the above described set of facts and circumstances, the affiant has probable cause to believe that Donald Monroe and Charles Minnis conspired to murder Michael Harris. Donald Monroe's part in the conspiracy was to pay Charles Minnis for the murder and to loan Minnis his car to search for the victim. The payment was to be in the form of money which are [sic] the proceeds of drug sales. Such drug sales take place from Donald Monroe's residence, located at 19 T Street, Northeast, Washington, DC. Since the arrest of Charles Minnis, Donald Monroe has been directed to use the "murder for hire" money to pay Charles Minnis' attorney. The affiant has probable cause to believe that evidence of such criminal activity is currently present inside of 19

T Street, Northeast, and requests a search warrant for that location ....

During Harris's first trial, defense counsel argued that the Trainum Affidavit was a party admission that was admissible against the government under *Freeland v. United States,* 631 A.2d 1186 (D.C.1993), and *United States v. Morgan,* 189 U.S.App. D.C. 155, 581 F.2d 933 (1978). Counsel argued that the affidavit was particularly important as "corroboration evidence" to support Harris's testimony and expressed willingness to redact any inadmissible information from the affidavit. The trial court agreed that the Trainum Affidavit was relevant to Harris's defense because the defense theory that Donald Monroe sent James Monroe to kill Harris was "more likely true if [Donald Monroe] acted consistent with that theory, even after [Harris killed James Monroe]." The court nonetheless ruled that the affidavit would be excluded from evidence. The court reasoned that the hearsay statements of witnesses reported in the affidavit should not be admitted because the government was not "vouching" for the truth of those statements. The court also reasoned from what it perceived to be the purpose of the Trainum Affidavit that the government had endorsed only the "irrelevant" statements in the affidavit regarding drug trafficking at Donald Monroe's residence and not the statements regarding Donald Monroe's participation in a conspiracy to kill Michael Harris:

> The affidavit seeks evidence to prove that Donald Monroe is a drug dealer and not that Donald Monroe conspired to murder Michael Harris.
>
> Given the purpose—the stated purpose of the warrant affidavit, given the distinction of the warrant affidavit between

just a report of what people say and the confirmed and corroborated reports of what others say, it's clear that what the Government was vouching for were the facts that were in support of a finding of probable cause to believe that inside of 19 T Street Northeast, there was evidence of drug trafficking, period, and as a result, the Government should be foreclosed from denying that there is evidence of drug trafficking inside of 19 T Street, which is irrelevant to our case.[2] To the extent that there is a comment— or even sentences in this affidavit that suggest the detective's opinion that Donnie Monroe had a basis for and an intent to pay for the death or the murder or the shooting of Michael Harris, none of that is corroborated in the warrant affidavit. It is not a statement. These are not statements I can conclude the Government swore were true as opposed to just truly spoken and were basically tangential, or irrelevant, to the purpose for which the warrant affidavit ... was submitted.

Defense counsel pointed out that Detective Trainum's ultimate conclusion that Donald Monroe had conspired to murder Harris did not include multiple levels of hearsay, but the court reaffirmed its ruling without comment.

At Harris's second trial, defense counsel again argued for the admission of the Trainum Affidavit. The trial court again concluded that the affidavit was inadmissible. The court reasoned that admitting the government's stated views of the facts would invade the province of the jury to determine the facts for itself.

### B.

"We have adopted the substance of Federal Rule of Evidence 801(d)(2) on 'admis-

---

**2.** We construe this statement to mean that, if the evidence of drug trafficking had been relevant, the court would have allowed Harris to introduce at least part of the affidavit as an admission by the government.

sion by party-opponent,' and deem such statements to be admissible into evidence." *Johnson v. Leuthongchak,* 772 A.2d 249, 250 (D.C.2001). Rule 801(d)(2) applies to out-of-court statements offered against a party that are:

(A) the party's own statement in either an individual or representative capacity or (B) a statement of which the party has manifested an adoption or belief in its truth, or (C) a statement by a person authorized by the party to make a statement concerning the subject, or (D) a statement by the party's agent or servant concerning a matter within the scope of the agency or employment, made during the existence of the relationship, or (E) a statement by a coconspirator of a party during the course of and in furtherance of the conspiracy.

■ Party admissions differ from most out-of-court statements in that their admissibility does not require the demonstration of "guarantee[s] of trustworthiness" but is based rather upon the identity of the speaker. FED. R. EVID. 801 advisory committee's note. Therefore, "[p]arty admissions do not require foundations to be admissible as substantive evidence; they need not have been made on personal knowledge and may be in opinion form." *In re M.D.,* 758 A.2d 27, 32 (D.C.2000). So long as the statement is fairly attributable to the party, "it makes no difference whether the adopting party had any personal knowledge of the truth of the matters mentioned in the statement." 5 WEINSTEIN'S FEDERAL EVIDENCE § 801.31[3][b] (2003); *accord,* 2 MCCORMICK ON EVIDENCE § 255, at 139–40 (5th ed.1999); 4 WIGMORE, EVIDENCE § 1053(1), at 16 (Chadbourn rev.1972); FED. R. EVID. 801 advisory committee's note.

One rationale for this "generous treatment" of party admissions, *id.,* is a party's ability to rebut the out-of-court statement by "put[ting] himself on the stand and explain[ing] his former assertion." *Chaabi v. United States,* 544 A.2d 1247, 1248 (D.C. 1988) (quoting 4 WIGMORE, EVIDENCE § 1048, at 5). Another is the sense that in an adversary system a party should be held to its prior statements and should not be able to raise a hearsay objection to statements made by, adopted by, or imputed to that party. *See* FED. R. EVID. 801 advisory committee's note; *accord,* 2 MCCORMICK ON EVIDENCE § 254, at136; *see United States v. GAF Corp.,* 928 F.2d 1253, 1262 (2d Cir.1991).

■ As with any other evidence, however, an admission may not be received into evidence if its probative value is substantially outweighed by "countervailing circumstances . . . [such as] prejudice, confusion of the issues, cumulative testimony, [or] undue delay." *Keene v. United States,* 661 A.2d 1073, 1076 (D.C.1995) (quoting *Johns v. United States,* 434 A.2d 463, 473 (D.C.1981)); *see United States v. Kattar,* 840 F.2d 118, 131 n. 10 (1st Cir.1988). The party admission rule does not give parties a license to use an opponent's statement to introduce a "red herring." *United States v. Woo,* 917 F.2d 96, 98 (2d Cir.1990) (holding that statement that might qualify as an admission was properly excluded on Rule 403 grounds); *see also* 5 WEINSTEIN'S FEDERAL EVIDENCE § 801.30[3]; 2 MCCORMICK ON EVIDENCE § 254 at 138.

■ A party may make an admission "by adopting or acquiescing in the statement of another." Fed.R.Evid. 801 advisory committee's note. Whether a party has adopted the statement of another is a preliminary question of fact for the trial judge, *see Foreman v. United States,* 792 A.2d 1043, 1052 (D.C.2002), which is determined by considering the "context . . . and the surrounding circumstances" of the

claimed adoption. *Brown v. United States*, 464 A.2d 120, 124 (D.C.1983). The rule does not require an explicit statement of adoption; all that is necessary is some "manifestation of a party's intent to adopt another's statements, or evidence of the party's belief in the truth of the statements." *United States v. Rollins*, 862 F.2d 1282, 1296 (7th Cir.1988); *see United States v. Paulino*, 13 F.3d 20, 24 (1st Cir.1994). The adoption can be manifested "in any appropriate manner." FED. R. EVID. 801 advisory committee's note. For example, a criminal defendant can adopt the statements of another as his own admissions "if it clearly appears that the accused understood and unambiguously assented to the statements." *Foreman*, 792 A.2d at 1052 (quoting *Brown*, 464 A.2d at 123); *see Robinson v. United States*, 606 A.2d 1368, 1371 (D.C.1992). The party seeking to introduce evidence as an adopted admission has the burden to produce "specific proof of such adoption." *United States v. Am. Tel. & Tel. Co.*, 516 F.Supp. 1237, 1239 (D.D.C.1981).

■ A party's signature on a document created by another is a circumstance that supports a finding of adoption. *See McQueeney v. Wilmington Trust Co.*, 779 F.2d 916, 930 (3d Cir.1985) (holding that seaman's signature on Sea Service records prepared by others was "an unequivocal adoption of the contents therein"); *Pillsbury Co. v. Cleaver–Brooks Div. of Aqua–Chem, Inc.*, 646 F.2d 1216, 1218 (8th Cir. 1981) (holding that supervisor adopted contents of employee report by signing each page of the report); *United States v. Ward*, 575 F.Supp. 159, 162 (E.D.N.C. 1983) (holding that signature on food stamp application reduced to writing by another constituted an adoption); 5 WEINSTEIN'S FEDERAL EVIDENCE § 801.30[3]; *cf. United States v. Orellana–Blanco*, 294 F.3d 1143, 1148 (9th Cir.

2002) (holding that although defendant's signature "would ordinarily make adoption plain," statement was not adopted where circumstances suggested that Spanish-speaking defendant did not understand contents of statement).

■ Submission of documents to a court also suggests adoption of the documents. *See Fox v. Taylor Diving & Salvage Co.*, 694 F.2d 1349, 1355–56 (5th Cir.1983) (holding that party adopted the testimony of his expert witness); *Buckley v. Airshield Corp.*, 116 F.Supp.2d 658, 664 (D.Md. 2000) (holding that party adopted documents by submitting them as exhibits in a separate case); *see also In re Japanese Elec. Prods. Antitrust Litig.*, 723 F.2d 238, 301 (3d Cir.1983) (holding that party adopted documents by referring to them in response to interrogatories). One commentator has concluded that documentary evidence submitted to a court should be treated as an adopted admission in most cases, for "[w]hen a party offers in evidence a deposition or an affidavit to prove the matters stated therein, the party knows or should know the contents of the writing so offered and presumably desires that all of the contents be considered on its behalf since only the portion desired could be offered." 2 MCCORMICK ON EVIDENCE § 261, at 165–66; *accord*, 4 WIGMORE, EVIDENCE § 1075, at 149 n. 2.

■ Another factor supporting a finding of adoption is "the extent that the adoptive party accepted and acted upon the evidence." *Pilgrim v. Trs. of Tufts Coll.*, 118 F.3d 864, 870 (1st Cir.1997) (holding that employer who followed recommendations of grievance committee had adopted committee's report); *see Wright–Simmons v. City of Oklahoma City*, 155 F.3d 1264, 1268–69 (10th Cir.1998) (holding that employer who forced employee to resign based on investigative report and attached witness interview notes had

adopted report and notes); 4 WIGMORE, EVIDENCE § 1073 at 138 ("The party's use of a document made by a third person will frequently amount to an approval of his statements as correct, and thus it may be received against him as an admission by adoption.").

C.

We have held that, in certain circumstances, statements of Assistant United States Attorneys are party admissions that are admissible against the government in subsequent criminal cases. *See Freeland v. United States,* 631 A.2d 1186 (D.C.1993). In *Freeland,* the appellant was charged with murdering his wife. Freeland's defense was that his wife was killed by agents of William Hawthorne, who allegedly had been threatening Freeland because he was a potential witness against Hawthorne in a murder trial that was being prosecuted in the Eastern District of Virginia. *See id.* at 1188. In support of his theory Freeland attempted to introduce a motion filed in Hawthorne's murder trial by AUSA Lawrence Leiser, in which Leiser sought to introduce Freeland's grand jury testimony on the ground that Freeland was unavailable. *See id.* at 1191. To demonstrate Freeland's unavailability, Leiser represented in his motion that Freeland had told the government that he was reluctant to testify because he and his family had been threatened with retaliation by Hawthorne. *See id.* The trial court in Freeland's case held that Leiser's motion was not a party admission, in part because of its conclusion that the United States Attorney's offices in Virginia and the District of Columbia could not be considered the same party. *See id.*

We reversed the trial court and held that Leiser's motion was a party admission that should have been admitted. We agreed with the views of the First Circuit, the D.C. Circuit, and then-Judge (now Justice) Stevens that the United States is "bound by the position taken in a formal prosecution ... [and] cannot escape a view taken in a separate prosecution on the ground that one prosecution simply represents the views of its agents who participate in that particular prosecution." *Id.* at 1192 (citing *United States v. Kattar,* 840 F.2d 118, 130 (1st Cir.1988); *United States v. Morgan,* 189 U.S.App. D.C. 155, 160, 581 F.2d 933, 938 (1978); *United States v. Powers,* 467 F.2d 1089, 1097–98 (7th Cir. 1972) (Stevens, J., dissenting)). It was immaterial that Leiser's motion was filed by a Virginia AUSA, because the prosecutors in both cases spoke for the same Justice Department.[3]

Our decision in *Freeland* relied in part upon the analysis of the D.C. Circuit in *Morgan,* which we found "persuasive." 631 A.2d at 1194. In *Morgan,* police officers obtained a warrant to search a house based upon the sworn affidavit of a detective who stated that a reliable informant had told him that "Timmy" was selling drugs from inside the house. 189 U.S.App. D.C. at 156, 581 F.2d at 934. When they executed the warrant, the officers arrested Morgan but did not find "Timmy." *Id.* At trial Morgan attempted to introduce the informant's statements contained in the search warrant affidavit as evidence that some of the drugs found in the house belonged to "Timmy." *See*

---

**3.** It should be noted that although our opinion in *Freeland* stated that the United States was "bound" by a position it had taken in another prosecution, the court meant only that the United States could not object to the introduction of its prior statements as admissions of a party opponent. The *Freeland* court did not mean to suggest that the United States was bound *conclusively* by its prior statements, as if they were judicial admissions.

189 U.S.App. D.C. at 157 n. 5, 581 F.2d at 936 n. 5. The court found that the statements were admissible as adoptive admissions on the part of the government. The court reasoned that "sworn assurances to a judicial officer" in support of a search warrant "represent[ed] the position of the government itself." 189 U.S.App. D.C. at 159 n. 10, 581 F.2d at 937 n. 10 ("[W]hen the government authorizes its agent to present his sworn assurances to a judicial officer that certain matters are true and justify issuance of a warrant, the statements of fact or belief in the officer's affidavit represent the position of the government itself, not merely the views of its agent."). The court concluded that the government's sworn assurance that the informant's statements were "reliable" and sufficient to justify a search warrant manifested the government's adoption of the statements. 189 U.S.App. D.C. at 159, 581 F.2d at 937.

In *United States v. Warren,* 310 U.S.App. D.C. 1, 42 F.3d 647 (1994), the D.C. Circuit reaffirmed its holding that sworn statements of government agents that are presented to a court should be treated as party admissions while clarifying that unsworn statements made during the course of an investigation are not entitled automatically to the same treatment. In *Warren* the defendant attempted to introduce three statements made by police officers: two were statements contained in arrest reports; the third was a sworn statement of facts prepared by a Park Police officer, attached to a criminal complaint, and submitted to a magistrate judge. The court held that the two arrest reports were not party admissions, for having "not [been] sworn before a judicial

officer ... the Government cannot be said to have manifested a belief in their truth." 310 U.S.App. D.C. at 10, 42 F.3d at 656. The third statement, however, was sworn and was submitted to a court; that statement therefore was an adoptive admission. *See* 310 U.S.App. D.C. at 9, 42 F.3d at 656.

Several other courts have held that statements of a prosecutor made in a separate criminal case are party admissions. *See United States v. Salerno,* 937 F.2d 797, 812 (2d Cir.1991) (holding that closing arguments from other case claiming that defendant was only a "puppet" were party admissions in prosecution where defendant was charged as an active participant); *United States v. GAF Corp.,* 928 F.2d 1253, 1261 (2d Cir.1991) (holding that prior bill of particulars filed by government was a party admission); *United States v. Kattar,* 840 F.2d 118, 131 (1st Cir.1988) (holding that brief filed by United States in separate litigation that was inconsistent with its position in this prosecution should have been admitted); *State v. Worthen,* 765 P.2d 839, 847–48 (Utah 1988) (holding that letter written by prosecutor to trial judge was party admission). The party admission rule is "particularly" applicable to statements by government attorneys, who have the power to bind the government. WEINSTEIN'S FEDERAL EVIDENCE § 801.33[3]; *accord,* 2 MCCORMICK ON EVIDENCE § 257 at 142 n. 8; *see Giglio v. United States,* 405 U.S. 150, 154, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972).[4]

The government points out that a few courts have declined to apply the party admission rule to statements made by government employees in criminal cases. In

---

**4.** Some courts have gone even further, holding that statements by agents of the government are party admissions regardless of whether they were sworn or presented to a court. *See Garland v. State,* 834 So.2d 265, 267 (Fla.Dist.Ct.App.2002) (holding that un-

sworn forensics report was a party admission); *Allen v. State,* 787 N.E.2d 473, 479 (Ind.Ct.App.2003) (holding that unsworn prearrest statement of police officer was a party admission).

particular, the Seventh Circuit has held that the party admission rule should not be applied against the government in criminal cases because "no individual can bind the sovereign." *United States v. Prevatte,* 16 F.3d 767, 779 n. 9 (7th Cir.1994) (holding that out-of-court statement by police officer was not a party admission because "no individual can bind the sovereign"); *see United States v. Kampiles,* 609 F.2d 1233, 1246 (7th Cir.1979). The Seventh Circuit's reasoning reflects that of two cases decided before the adoption of the Federal Rules of Evidence. *See United States v. Pandilidis,* 524 F.2d 644, 650 (6th Cir. 1975) (pre-FRE decision relying on *Santos, infra,* and holding that IRS official's opinion that defendant was only guilty of a civil offense was not admissible); *United States v. Santos,* 372 F.2d 177, 180 (2d Cir.1967) (pre-FRE decision holding that officer's sworn affidavit identifying an individual other than defendant as an assailant was not a party admission because party admission rule generally did not apply to government in criminal cases). *Santos*'s continuing validity is doubtful in light of later Second Circuit decisions. *See Salerno,* 937 F.2d at 812 (applying party admission rule against government in a criminal case); *GAF Corp.,* 928 F.2d at 1261 (same).

▮ These cases are distinguishable on their facts—as, for instance, where they do not involve statements made or adopted by the government's counsel acting on its behalf but rather simply involve statements made by other government employees in which the government itself has not manifested an adoption. But to the extent these cases may be said to reflect a view that the party admission rule cannot be applied against the government in criminal cases at all, we are not persuaded—nor would precedent in this jurisdiction permit us to adopt that view. The language of the party admission rule provides no basis for creating a prosecutorial exception or an exception where the government is the party opponent. Such an exception is both inconsistent with our decision in *Freeland* and unfair in light of the applicability of the party admission rule to criminal defendants. "[A]t a minimum, the law of evidence regulates the mode of proof impartially for the subject and for the sovereign. The hearsay rule that troubles the former equally vexes the latter; the exceptions to the hearsay rule that ease the latter equally comfort the former." *Garland,* 834 So.2d at 267. We reaffirm and adhere to our holding in *Freeland* that the prior statements of an Assistant United States Attorney can be treated as party admissions.

In *Freeland,* the Assistant United States Attorney himself prepared and signed the motion he filed with the court; although we did not specify which provision of the party admission rule applied to that motion, the most applicable provisions are 801(d)(2)(A) for a party's own statement and 801(d)(2)(D) for statements by a party's agent. In the instant case, AUSA Keenan did not author the Trainum Affidavit. He approved and signed it and authorized its submission to the court. Therefore the most appropriate provision is 801(d)(2)(B), which applies to statements in "which the party has manifested an adoption or belief in its truth." To determine whether the adoptive admission rule applies, we must determine whether the context and circumstances surrounding AUSA Keenan's approval of the Trainum Affidavit demonstrate that Keenan manifested an intent to adopt the affidavit. *See Brown v. United States,* 464 A.2d 120, 124 (D.C.1983).

▮ An affidavit submitted in support of a search or arrest warrant implicates fundamental constitutional rights.

The Fourth Amendment mandates that "no Warrants shall issue, but upon Probable Cause, supported by oath or affirmation." The Warrant Clause "surely takes the affiant's good faith as its premise." *Franks v. Delaware*, 438 U.S. 154, 164, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978). The ability of a magistrate to evaluate the existence of probable cause depends upon the integrity of the affidavit, which should only contain information that "is believed or appropriately accepted by the affiant as true." *Id.* at 165, 98 S.Ct. 2674. We trust that officers will reflect carefully before asking a magistrate to find probable cause to invade interests protected by the Fourth Amendment. *Cf. Malley v. Briggs*, 475 U.S. 335, 343, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986) (holding that officers have only a qualified immunity for their decisions to seek warrants, in part because an affiant should "reflect, before submitting a request for a[n arrest] warrant, upon whether he has a reasonable basis for believing that his affidavit establishes probable cause").

 The Warrant Clause encourages such careful reflection by requiring search and arrest warrant applications to be supported by "oath or affirmation." The gravity of an oath or affirmation is an essential "aid to truth in the fact-seeking process." *Beckham v. United States*, 609 A.2d 1122, 1127 (D.C.1992). "An oath or affirmation reminds both the investigator seeking the search warrant and the magistrate issuing it of the importance and solemnity of the process involved." *State v. Tye*, 248 Wis.2d 530, 636 N.W.2d 473, 478 (2001). The "deep meaning" of an oath to tell the truth permits magistrates to rely on an officer's good faith in reporting facts when determining whether the facts support probable cause. *Watts v. United States*, 362 A.2d 706, 711 n. 8 (D.C.1976) (en banc).

 Just as we assume that officers will not swear out affidavits without careful reflection, we assume that prosecutors will not give their approval to warrant affidavits and applications lightly. We presume that prosecutors are aware of the significance of truthful affidavits and the gravity of the interests to be invaded. Although a prosecutor may not vouch for the truthfulness of every third party statement reported by the officer in the affidavit, by approving the warrant application the prosecutor certainly endorses the officer's conclusion that probable cause exists to believe that the crime described in the affidavit was committed (and, in the case of a search warrant, that evidence of that crime will be recovered by the search). A prosecutor's signed approval of a warrant application would be meaningless if it did not at least signify agreement that constitutional standards for issuance of the warrant have been met and the warrant should issue.

 In light of these considerations, we agree with appellant that AUSA Keenan unambiguously manifested his adoption on behalf of the government of Detective Trainum's conclusions that probable cause existed to believe that "Donald Monroe and Charles Minnis conspired to murder Michael Harris" and that the proposed search of Monroe's residence would recover evidence of that conspiracy.[5] The clearest indication of that adoption is on page

---

5. The trial court's finding that Detective Trainum, a homicide branch detective, only sought evidence to prove that Donald Monroe was a drug dealer is clearly erroneous. The stated purpose of the proposed search was to recover evidence of the murder conspiracy. The affidavit described the drug sales at Donald Monroe's residence as the source of the "murder for hire" money that Monroe was directed to use to pay Charles Minnis's attorney.

11 of the affidavit, the page that recites Trainum's conclusions that such probable cause existed and describes the items to be seized. AUSA Keenan's signed approval on that page, made with the knowledge that the document would be submitted to the court, can only mean that he agreed in his official capacity with the conclusions set forth there. By giving his signed approval as an AUSA, Keenan informed Judge Dorsey that Detective Trainum's decision to seek a search warrant came with the imprimatur of the United States. AUSA Keenan could not have approved the warrant application in good faith if he had not agreed, at the very least, with the officer's ultimate conclusion regarding the existence of probable cause. Our conclusion is, we think, well nigh inescapable: AUSA Keenan adopted (at a minimum) Detective Trainum's statement that there was "probable cause to believe that Donald Monroe and Charles Minnis conspired to murder Michael Harris," and that statement was admissible in evidence at Harris's behest as an adoptive admission by a party opponent—just as a comparable statement made or adopted by Harris (*e.g.,* "there is reason to believe that Donald Monroe did *not* conspire with Minnis") would have been admissible at the government's behest.

Moreover, we see no reason to think that the revelation of the government's prior admission as to Donald Monroe's involvement in the attempt to murder Harris would have confused the jury so as to justify exclusion of the evidence as substantially more prejudicial than probative. This was not a tangential matter and the government was not placed at any unfair disadvantage in having to address it. The government could have accounted for the discrepancy in its positions by explaining that the information in the affidavit proved to be incorrect (if that was indeed the case) or that it believed that Donald Mon-

roe was indeed the driving force behind the April 1996 attack but was not involved in the July 1995 incident. The fact that materially exculpatory evidence may complicate a trial is no ground to exclude that evidence; some trials are meant to be complicated and juries are capable of dealing with factual complexity.

 Although the prosecutor's approval of this search warrant application necessarily implies agreement with the affiant's conclusions as to probable cause, it does not necessarily imply agreement with the entire contents of the affidavit, *i.e.,* with all the subordinate facts set forth in the affidavit. Whether a statement by a third party (or any other fact) that the affiant includes in an affidavit has been adopted is a factual question that must be determined by looking to the context and surrounding circumstances. These circumstances include the essentiality of the third party statement to the determination of probable cause, the extent to which the affiant explicitly vouches for the reliability of the statement or its third party source, whether the statement is based upon the declarant's personal knowledge or hearsay, and any other indicia reasonably bearing on whether the prosecutor who approved the request for a warrant has manifested a belief in the truth of the statement. Where, as in the present case, the warrant application is based on numerous statements from several informants who individually may be more or less trustworthy, and some of the statements incorporate multiple levels of hearsay, it is an open question whether the government has manifested its adoption of any particular facts recited in the affidavit as partial support for the affiant's ultimate conclusion. We leave that fact-specific determination in this case for the trial court to undertake on remand in connection with the new trial that we order.

In this regard, we are not persuaded by the government's argument, *contra Morgan* (among other cases), that third party statements in a warrant affidavit should never be treated as admissions because the affidavit is prepared solely for "investigatory" as opposed to "prosecutorial" purposes. The majority opinion in *State v. Brown*, 170 N.J. 138, 784 A.2d 1244 (2001) drew such a distinction on public policy grounds and held (over a vigorous dissent) that because search warrant affidavits were submitted to judges during the "investigatory stage," any statements of informants contained within the affidavits should not be treated as party admissions, no matter how clearly the prosecutor manifested his belief in the statements. *See id.* at 1257. (The *Brown* majority did not address the principal issue before us in this case, which is whether the affiant's ultimate conclusion of probable cause was a party admission.) But the distinction between "investigatory" and "prosecutorial" stages is an artificial one that is ill-suited to answering the real question of whether the government adopted the statements in question. Whatever might be said regarding other statements made by law enforcement officers and approved by the government's attorneys during investigations, affidavits in support of search or arrest warrants do not deserve to be minimized categorically as "merely" investigative and hence tentative. An application for a warrant is not a mere investigative report or offhand remark. Its contents are not an undigested stew of investigative leads. The warrant affidavit is a sworn statement, reviewed and approved by the government's attorney, that the information known to the affiant and set forth in the application is reliable enough to engender a prudent belief that the subject of the warrant has committed a crime, and reliable enough as well to justify a search or seizure under the Fourth Amendment. We see little reason to exempt sworn, constitutionally required representations to the court from the party admission rule merely because they are made pre-indictment.

### III.

### A.

We turn to the trial court's refusal to send marshals to enforce the subpoena that the defense had served on Dwayne Drummond. Drummond was a defense witness whose proffered testimony was that he saw Donald Monroe's car drive past just before Harris was shot on April 23, 1996. Drummond's testimony therefore would have corroborated part of Harris's testimony. During jury selection on Thursday, June 11, 1998, defense counsel included Drummond in a list of possible witnesses and asked the court to sign a subpoena to secure his appearance. The court refused to address the request until after the jury was selected but signed the subpoena the next day (Friday, June 12), and Drummond was served that evening.

Drummond did not appear for court on Monday the 15th, and that morning defense counsel reported his absence and the fact that Drummond had been hostile to a defense investigator and was not answering his telephone. Defense counsel asked the court to send marshals to Baltimore to find Drummond. In the alternative, counsel asked the court to admit portions of Drummond's prior testimony[6] in which he reported seeing Donald Monroe's car drive

---

**6.** Drummond testified both at the grand jury and in the trial of Charles Minnis for his alleged assault on Harris.

past Harris on April 23, 1996. The court denied the request to admit the prior testimony on the ground that given the late service of the subpoena, the defense had not shown that Drummond was unavailable. The court also denied the request to send marshals to find Drummond and suggested that such an effort would be futile:

> Do you have any expectation that he will be found? If you can't find him by phone, why would we send the marshals? Because, understand, you're going to be done today. And I imagine there is some fun things to do in Baltimore that the marshals, you know, lunch at the harbor but they're not going to find him; right?

The court expressed the further belief that Drummond's testimony would be cumulative because "no one threatens to dispute" Harris's claim that Donald Monroe's car drove by. The court revisited the issue at the close of the evidence and reaffirmed its earlier ruling that Drummond was not unavailable and that "I don't think it is worth a delay to send Marshals out to find Drummond on the issue of whose car drove by."

### B.

 The trial court has discretion in exercising its power to secure the attendance of witnesses, but that discretion must be exercised in a manner consistent with the defendant's constitutional rights. *See United States v. Simpson,* 301 U.S.App. D.C. 203, 208–09, 992 F.2d 1224, 1229–30 (1993); *see also Johnson v. United States,* 398 A.2d 354, 361–62 (D.C.1979). "Few rights are more fundamental than that of an accused to present witnesses in his own defense." *Taylor v. Illinois,* 484 U.S. 400, 408, 108 S.Ct. 646, 98 L.Ed.2d 798 (1988); *see Smith v. United States,* 809 A.2d 1216, 1223 (D.C.2002). The Sixth Amendment's Compulsory Process Clause

further guarantees the right of an accused "to the government's assistance in compelling the attendance of favorable witnesses at trial." *Taylor,* 484 U.S. at 408, 108 S.Ct. 646 (quoting *Pennsylvania v. Ritchie,* 480 U.S. 39, 56, 107 S.Ct. 989, 94 L.Ed.2d 40 (1987)); *see* U.S. Const. amend. VI.; *Smith,* 809 A.2d at 1223; *King v. United States,* 550 A.2d 348, 353 (D.C.1988). The Compulsory Process Clause is not violated each time a defendant is deprived of a witness's testimony, but only when the witness's testimony would have been "favorable and material" and "not merely cumulative to the testimony of available witnesses." *Bardoff v. United States,* 628 A.2d 86, 92–93 (D.C. 1993) (quoting *United States v. Valenzuela–Bernal,* 458 U.S. 858, 872–73, 102 S.Ct. 3440, 73 L.Ed.2d 1193 (1982)). Moreover, a defendant is responsible for exercising his right to subpoena and present witnesses at an appropriate time and in a manner that is consistent with the procedures of the court. *See Davis v. United States,* 735 A.2d 467, 472 (D.C.1999).

 The trial court concluded that sending marshals to secure Drummond's appearance was unwarranted because his testimony would be cumulative, and because, in the court's judgment, there was little likelihood of finding Drummond on short notice. We think that these reasons are not sufficient to support the court's decision. According to the defense proffer, Drummond would have testified that he saw Donald Monroe's car drive past on the night Harris was shot. Because Harris also testified to this point, the trial judge deemed Drummond's testimony to be unnecessary because the jury "would believe" Harris's account. Harris's testimony was uncorroborated, however, and made by a defendant with an obvious bias. The government cross-examined Harris about his initial failure to implicate Donald

Monroe and suggested that Harris's claims about Donald Monroe were a convenient way to shift blame. In these circumstances Drummond's testimony would not have been cumulative. We must view with skepticism the suggestion that corroboration of the otherwise uncorroborated but material testimony of an accused defendant would add nothing to the evidence before the jury. "[C]orroborative witnesses may cause a factfinder to credit testimony by a single witness (a self-interested defendant) whose testimony would otherwise fail to persuade." *Forrester v. United States*, 707 A.2d 63, 64 (D.C.1998) (per curiam); *see also United States v. North*, 285 U.S.App. D.C. 343, 391, 910 F.2d 843, 891 (1990) ("Clearly, corroborative evidence can be material to a defense."). Drummond's corroboration of Harris's otherwise uncorroborated testimony would have been both favorable and material to Harris's defense. *See Bardoff*, 628 A.2d at 92–93. Harris therefore had a constitutional right to compulsory process to secure Drummond's presence at trial.

The trial court also reasoned that sending marshals to Baltimore would have been futile, believing that Drummond was "simply going to duck the marshals for one day." The trial court made this determination on Monday morning, when the only evidence before it was that Drummond had failed to appear in court in compliance with the subpoena, had been hostile to defense investigators, and could not be reached by telephone. Although this evidence did suggest that Drummond was avoiding the subpoena, it cannot sustain the trial court's conclusion that Drummond could not have been located on Monday. Defense counsel had an address where Drummond had been located on Friday night, and the fact that Drummond did not answer his telephone on Monday morning does not imply that law enforcement officers would have been unable to locate Drummond at that address or at another location that day. To be sure, it is possible that Drummond might not have been located on Monday had the marshals been sent for him, but the trial court did not have enough evidence to predict that. When a trial court exercises its discretion, "the factual record must be capable of supporting the determination reached by the trial court." *Johnson*, 398 A.2d at 364.

Moreover, the trial court does not need to be certain of success before sending marshals to retrieve a recalcitrant witness. The Constitution does not mandate exercises in futility, but the Compulsory Process Clause does require a trial court to exercise its powers to secure the attendance of favorable and material defense witnesses where there is some reasonable possibility of success. *See Simpson*, 301 U.S.App. D.C. at 209, 992 F.2d at 1230. "Once the defendant has alleged facts that, if true, demonstrate the necessity of the witness's testimony, the court is obligated to lend its authority in compelling the sought-after witness's appearance." *Id.* Under these circumstances, we believe the trial court abused its discretion by not making that effort.

The trial court's decision was motivated in part by a desire to complete the trial expeditiously. While efficiency is a laudable goal, it must yield to "a justifiable request for delay." *Ungar v. Sarafite*, 376 U.S. 575, 589, 84 S.Ct. 841, 11 L.Ed.2d 921 (1964). *See also Daley v. United States*, 739 A.2d 814, 819 (D.C.1999) (Schwelb, J., concurring). Defense counsel did not request a continuance of the trial to secure Drummond's testimony, and we do not decide whether a trial continuance should have been granted. We note, however, that closing arguments were made on Tuesday, June 16, and the trial would have been delayed little if the marshals had

found Drummond on Monday and returned him to testify on Tuesday.

The government argues that the failure of the defense to subpoena Drummond before trial suggests a lack of diligence that militates in favor of the trial court's decision. We do not agree that the timing of Drummond's subpoena was of significance to a proper exercise of the trial court's discretion in this case. Drummond was subpoenaed on Friday night, and defense counsel informed the court of his failure to appear at the beginning of proceedings on Monday morning, the day on which the defense case was to open. *See Simpson,* 301 U.S.App. D.C. at 209, 992 F.2d at 1230 (holding that a request for bench warrants was not untimely when the witnesses were under subpoena and the day they failed to appear was "the first day on which they were scheduled to testify"). This is not a case in which defense counsel failed to timely apprise the trial court of a witness's noncompliance with a subpoena. *See Davis v. United States,* 735 A.2d 467, 473 (D.C.1999) (holding that defense counsel's five-day delay before requesting the judge to issue bench warrant militated against granting the motion to reopen the defense). Defense counsel acted with sufficient diligence to preserve Harris's compulsory process rights.[7]

## IV.

We have concluded that the trial court made two errors in this case, the effect of which was to prevent the introduction of all corroborative evidence of Harris's testimony. We must next con-

sider whether the errors should be discounted as harmless. Trial court errors that do not implicate constitutional rights do not warrant reversal if we can say with fair assurance that the judgment was not substantially swayed by the error. *See Kotteakos v. United States,* 328 U.S. 750, 765, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946). When a defendant's constitutional rights are affected by a trial court error, we can affirm only if we are convinced that the error was harmless beyond a reasonable doubt. *See Chapman v. California,* 386 U.S. 18, 24, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967). The *Kotteakos* standard applies to the exclusion of the Trainum Affidavit; the *Chapman* standard applies to the refusal to send marshals to secure Drummond's appearance.

Harris argues that the *Chapman* standard for constitutional error applies to the decision to exclude the Trainum Affidavit because the exclusion implicated his constitutional right to present a defense. *See Bassil v. United States,* 517 A.2d 714, 716–17 (D.C. 1986). The *Chapman* test does apply where "the trial court's evidentiary ruling wholly deprived the defendant of any opportunity to ... present evidence concerning ... a central issue in the case." *Clark v. United States,* 639 A.2d 76, 81 (D.C.1993); *see Howard v. United States,* 656 A.2d 1106, 1118 (D.C. 1995) (holding that *Chapman* standard applied where defendant was only permitted to introduce cryptic and vague evidence on provocation). In this case, however, Harris was not "wholly deprived" of his ability to present evi-

---

7. In light of our conclusion that the trial court abused its discretion by refusing to send marshals to secure Drummond's appearance, we have no need to decide whether the trial court erred by rejecting Harris's alternative suggestion to admit Drummond's prior recorded testimony. We express no view one way or the other as to whether that testimony will be admissible in the event that Drummond is unavailable as a witness at the retrial of this case; if that issue arises, its proper resolution will depend in part on factual determinations that belong to the trial court.

dence of Donald Monroe's involvement; Harris's testimony presented evidence of that involvement. When the defense has been permitted to introduce evidence on a particular issue, the trial court's exclusion of additional evidence on that issue does not implicate the constitutional right to present a defense. *See Clark,* 639 A.2d at 82; *see also Morgan,* 189 U.S.App. D.C. at 161, 581 F.2d at 939 (applying *Kotteakos* standard to exclusion of government's party admission); *Freeland,* 631 A.2d at 1194 (same). Although corroborative evidence of Harris's account would have strengthened the defense case, Harris was not deprived of his constitutional right to present a defense. Therefore we review the exclusion of the Trainum Affidavit for *Kotteakos* error.

On the other hand, the trial court's refusal to send marshals to secure Drummond's attendance implicated Harris's constitutional right to compulsory process. *See Smith v. United States,* 809 A.2d 1216, 1225–26 (D.C.2002). The violation of such a "fundamental element of due process of law" triggers *Chapman* review. *Martin v. United States,* 606 A.2d 120, 127 (D.C. 1991); *see United States v. Rhynes,* 218 F.3d 310, 323 (4th Cir.2000) (holding that erroneous sanction preventing defendant from calling sole corroborating witness was *Chapman* error). Therefore we must reverse unless this error was harmless beyond a reasonable doubt.

■ The fact that the only evidence supporting Harris's self-defense theory was his own uncorroborated testimony is particularly important in assessing the harmlessness of the trial court's errors. Harris's testimony was inherently suscep-

tible to doubt because of his status as an accused defendant with a motive to fabricate. *See Forrester,* 707 A.2d at 64; *see also Freeland,* 631 A.2d at 1195 (holding that defendant's uncorroborated testimony could be viewed by the jury as "self-serving"). Moreover, in challenging Harris's self-defense claim, the government highlighted in particular Harris's failure to implicate Donald Monroe after either the July 1995 shooting or the April 1996 shooting.[8] Corroboration of Harris's account would have placed the defense case on considerably firmer ground. If the jury had learned that the government itself had sought a search warrant because it had reason to believe that Donald Monroe hired someone to kill Harris in 1996, the jury might have given more credit to Harris's claim that Donald Monroe sent his uncle and Lowe to kill Harris in 1995. Similarly, if the jury had heard a witness corroborate part of Harris's account about Donald Monroe's involvement, the jury might have given more credit to the remainder of Harris's story.

The jury's verdict of not guilty on the charge of murder and guilty on the lesser-included offense of voluntary manslaughter reflects one of three possibilities. To reach a rational verdict of voluntary manslaughter, the jury must have found either (1) that Harris subjectively believed that his life was in danger but that his belief was objectively unreasonable, or (2) that Harris used an unreasonable amount of force in responding to the threat. *See Swann v. United States,* 648 A.2d 928, 930 (D.C.1994). A third possibility is that the jurors disagreed among themselves about the validity of Harris's self-defense theory and reached a compromise verdict in lieu

---

8. We do not suggest that the government acted inappropriately in questioning Harris's claims about Donald Monroe. The government was not bound to adhere to the facts it

had adopted as party admissions, the way it would have been bound by judicial admissions.

of either finding Harris guilty of murder or acquitting him of all charges. Corroboration of Harris's claims about Donald Monroe's involvement might have changed the outcome under any of these scenarios. If the jury decided that Harris's belief was objectively unreasonable, corroboration of his account might have convinced the jury that Donald Monroe in fact did send Lowe and James Monroe to kill Harris and that Harris's reaction was in fact objectively reasonable self-defense. If the jury's decision was based on a belief that Harris used excessive force, corroboration of his account could have strengthened the credibility of Harris's claim that Lowe fired first and supported a conclusion that Harris used a reasonable degree of force. Although we do not presume that the jurors returned a compromise verdict, if they did, it is possible that corroboration of Harris's testimony could have convinced the entire jury that Harris's account was truthful. *Cf. Williamson v. State*, 692 P.2d 965, 971 n. 6 (Alaska Ct.App.1984) (recognizing possibility of compromise manslaughter verdict in harmless error analysis).

To put the issue a little differently, it is fair to say that, by returning a verdict of voluntary manslaughter, the jury apparently found Harris credible in part but not wholly credible. When a jury has rejected part of a witness's uncorroborated story and accepted other parts, the exclusion of corroborative evidence rarely will be harmless error. *Cf.* 3A CHARLES A. WRIGHT, FEDERAL PRACTICE & PROCEDURE 2D § 854, at 306 ("[A] court should be especially loath to regard any error as harmless in a close case, since in such a case even the smallest error may have been enough to tilt the balance.").

After considering the corroborative impact that the government's adoptive admission of statements in the Trainum Affidavit and the proffered testimony of Drummond might have had on the jury's assessment of Harris's self-defense claim, and hence on the verdict, we cannot find that the errors in this case were harmless with the requisite degree of certainty. We conclude that the exclusion of the Trainum Affidavit was not harmless by the measure of *Kotteakos,* and that the refusal to send marshals to locate Drummond was not harmless beyond a reasonable doubt as required by *Chapman.*

## V.

For the foregoing reasons, we reverse Harris's convictions and remand for a new trial.

*So ordered.*