Thomas **HAGER**, Appellant,

v.

**UNITED STATES**, Appellee.

No. 01–CF–594, 01–CF–617.

District of Columbia Court of Appeals.

Argued Dec. 10, 2002.

Decided Sept. 2, 2004.

---

**1144**

Richard K. Gilbert, Washington, DC, appointed by the court, for appellant.

Jonathan W. Haray, Assistant United States Attorney, with whom Roscoe C. Howard, Jr., United States Attorney at the time the brief was filed, and John R. Fisher, Roy W. McLeese III, and Valinda Jones, Assistant United States Attorneys, were on the brief, for appellee.

Before FARRELL, REID and WASHINGTON, Associate Judges.

REID, Associate Judge:

Appellant Thomas Hager appeals his conviction in No. 01–CF–594 (F–788–99) on a charge of obstructing justice, in violation of D.C.Code § 22–722 (1996),[1] and his convictions in No. 01–CF–617 of first-degree burglary while armed, in violation of § 22–1801(a), –3202,[2] felony murder while armed (three counts) and first-degree premeditated murder while armed, in violation of § 22–2401, –3202,[3] attempted robbery of Jerome Robinson and of Lora Watkins while armed, in violation of § 22–2901, –3202,[4] possession of a firearm during a crime of violence, in violation of § 22–3204(b) (two counts),[5] and carrying a pistol without a license, in violation of § 22–3204(a).[6] On appeal he primarily contends that the trial court erred by denying his motions to (1) present expert testimony on eyewitness identification, and (2) suppress evidence. We affirm the judgment of the trial court.

**FACTUAL SUMMARY**

1. Recodified at D.C.Code § 22–722 (2001).

2. Recodified at D.C.Code §§ 22–801(a), –4502 (2001).

3. Recodified at D.C.Code §§ 22–2101, –4502 (2001).

4. Recodified at D.C.Code §§ 22–2801, –4502 (2001).

5. Recodified at D.C.Code § 22–4504(b) (2001).

6. Recodified at D.C.Code § 22–4504(a) (2001).

At Mr. Hager's second trial,[7] the government presented evidence showing that around 11:00 p.m. on March 30, 1995, Jerome Robinson was murdered in his home on Nelson Street in the Southeast quadrant of the District of Columbia by two armed intruders wearing ski masks. The men forced their way into Mr. Robinson's apartment and bedroom where he and his girlfriend, Lora Watkins, and their six-month-old daughter were sleeping. Mr. Robinson shook Ms. Watkins and asked if she heard a noise. She heard "three loud bangs" and Mr. Robinson "jumped up" and saw men with guns. Two men with hooded jackets and ski masks ran into the bedroom, turned on the light, and demanded money. The taller of the two gunmen, identified as David Parker, directed Mr. Robinson out of the bedroom and into the living room.[8] Ms. Watkins remained in the bedroom with the child. Mr. Hager asked if she knew "where any money was." When she replied, "no," he instructed her to get down on the floor. She removed the baby from the bed and "laid on top of her." Shortly thereafter she heard Mr. Robinson express willingness to give the intruders what they wanted. Mr. Parker demanded money and Ms. Watkins heard a loud struggle in the living room. She also heard gunshots and Mr. Parker's call for help. As Mr. Hager ran to the living room, Ms. Watkins heard Mr. Robinson call for his mother who lived upstairs in the four-apartment building, followed by more shots and the sound of men exiting the apartment. There were more gunshots outside the building. Ms. Watkins went upstairs with the baby, spoke with Mr. Robinson's mother, did not see Mr. Robinson, and ran back downstairs and out the front door of the building. She found Mr. Robinson breathing on the sidewalk but unresponsive. He had been shot eight times in his back and arms and soon died. Ballistics evidence revealed that two guns were used during the intrusion into Mr. Robinson's apartment and his murder, a .40 caliber Glock semi-automatic pistol, and a SWD 11 semi-automatic pistol.[9] The SWD 11 was found in Mr. Robinson's living room, and government witness Lloyd Johnson had seen Mr. Parker with a .40 caliber Glock prior to the murder. Two fingerprints lifted from the magazine clip of the SWD 11 matched those of Mr. Hager's "right little finger." In the aftermath of the incident, Mr. Hager and Mr. Parker made incriminating statements to Charles Johnson, also a government witness, and Lloyd Johnson.

## ANALYSIS

### The Eyewitness Identification Issue

Mr. Hager contends that the trial court abused its discretion by denying his "motion *in limine* to admit expert testimony on the lack of correlation between the confidence in and accuracy of eyewitness identifications." The government argues there was no abuse of discretion since the trial court presented "sound reasons for denying the motion."

Ms. Watkins did not formally identify Mr. Hager as an assailant until almost two years after Mr. Robinson's murder. Ms. Watkins had first noticed Mr. Hager in late 1993, and for well over a year saw him on a daily basis outside Mr. Robinson's apartment building but did not know his name. She exchanged greetings with him and heard him converse with other people.

---

7. The first trial resulted in a mistrial except for one charge.

8. Mr. Parker was indicted together with Mr. Hager, but the government dismissed his case prior to trial.

9. During the trial, as the government notes, the SWD 11 at times was called a Mac 11, a "very similar" weapon.

She explained that she did not identify Mr. Hager immediately after Mr. Robinson's murder in part because she feared retaliation.[10] She claimed, however, that she reported Mr. Hager's first name to a detective shortly after the crime, asked whether he could check Tommy out, and said he committed the murder.[11]

The investigation of Mr. Robinson's murder became dormant after May or June 1995. Then, around April 1997, the police resumed the investigation. A detective contacted Ms. Watkins and displayed a nine-picture photo array to her. She immediately identified Mr. Hager as one of the assailants. Although he wore a ski mask during the crimes, Ms. Watkins identified Mr. Hager at his first trial based on facial features that could be seen in spite of the mask—his "eyes, mouth, complexion, height, buil[d] and voice." At that trial, she asserted that she was "real sure" that Mr. Hager was one of the assailants. During the second trial she stated that she was "[o]ne hundred percent sure" that Mr. Hager was in the apartment with a gun on the night of Mr. Robinson's murder. She identified him by his "build," "complexion," "height" and "voice." [12]

Prior to the commencement of his second trial, Mr. Hager proposed to introduce the testimony of Dr. Solomon Fulero. That testimony would be directed only to Lora Watkins' identification of Mr. Hager as the person who fatally shot Mr. Robinson.[13] Dr. Fulero holds a doctorate in

10. Ms. Watkins also attributed the delay in her identification to the initial effort of the police to implicate her in the murder of Mr. Robinson, accusing her of "setting [Mr. Robinson] up." Although the police told Ms. Watkins that she would be taken to the hospital right after Mr. Robinson was shot, they instead took her to the police station. At that time, she did not know Mr. Robinson's condition and was worried about him. In addition, she did not know Mr. Hager's name at that time. The day after the murder, she was certain Mr. Hager was one of the intruders but by then he had befriended Mr. Robinson's family and she did not think anyone would believe that he had been involved with the murder.

11. At another point in her direct testimony at the second trial Ms. Watkins was asked whether in 1995 she "ever [told the police] it was Tommy Hager, why haven't you arrested him or anything of that nature?" She replied, "No."

12. She stated that Mr. Hager was 5'4" in height, the same as her height. On cross-examination, Ms. Watkins was confronted with her statement to the police hours after the crimes, that the shorter of the two assailants was 5'9". She responded that 5'9" "was an incorrect statement." She identified the taller of the assailants as 6' tall, the exact height of Mr. Parker.

13. Mr. Hager's motion stated that Dr. Fulero "will tell the jury that controlled experiments have led him and other leading experts in the field to draw the following general conclusions";

a. In general, the level of an eyewitness' confidence is not closely correlated to the likelihood that the eyewitness' identification is accurate.

b. Human beings are poor judges of the quality of their own perception and memory.

c. The correlation between witness confidence and accuracy is weakest where the witness had a limited opportunity to observe, and did so under poor viewing conditions.

d. A witness may over time become increasingly confident in the accuracy of his identification. The apparent growth in confidence may result from (1) suggestions by the authorities—either explicit or implicit, either proper or improper—that the defendant is in fact guilty, (2) actions by the suspect, such as flight, (3) the eyewitness' own desire to "get" someone for what happened, and/or (4) the "rehearsal effect"— the relaxation, ease, and confidence that a witness feels as he repeats his story and begins to feel more comfortable with it.

e. Regardless of the explanation for an eyewitness' apparent growth in confidence, that increased confidence has no correlation whatsoever to the likelihood that the eyewitness' identification is accurate.

psychology and a law degree. He specializes in legal psychology.

A hearing on Mr. Hager's motion occurred on September 1, 2000, and on October 5, 2000, the trial court issued a memorandum opinion and order denying the motion. Following a review of decisions in this jurisdiction relating to the eyewitness identification issue, the trial court declared: "[T]he proffered expert testimony is not beyond the ken of the average lay person and would not be helpful to the trier of fact." The court pointed out that Ms. Watkins was not identifying a stranger, and as Dr. Fulero had acknowledged in another case, "in situations when the witness knows the suspect expert testimony in this area is less helpful." Furthermore, Dr. Fulero's psychological studies concentrated on "situations where the eyewitness is identifying a stranger." The court also noted "other factors that [Mr. Hager] may use and has used to discredit the accuracy of the witness's identification, such as, the witness's relationship with the decedent, the lighting conditions, the witness's inability to view the suspects because they wore masks, and the stress and fear caused by the event."

 "As we have often reiterated in a number of contexts, the admission of expert testimony is committed to the broad discretion of the trial court and a ruling either admitting or excluding such evidence will not be disturbed unless manifestly erroneous." *Green v. United States,* 718 A.2d 1042, 1050 (D.C.1998) (citing *Dyas v. United States,* 376 A.2d 827, 831 (D.C.1977)) (quoting *Salem v. United States Lines Co.,* 370 U.S. 31, 82 S.Ct. 1119, 8 L.Ed.2d 313 (1962)) (internal quotation marks and other citations omitted). "[E]xpert testimony is admissible to help the jury to do its work and not to do the jury's work for it." *Steele v. D.C. Tiger Market,* No. 01–CV–1193 (2004), 854 A.2d 175, 181, 2004 D.C.App. Lexis 384 at *11–

12. Thus, "[i]n a jury trial the judge must exercise discretion to decide whether the proffered expert testimony is likely to assist the jury in the performance of its duties—that is to say, in understanding the evidence, determining the facts that must be found and rendering its verdict." *Id.* at 181, 2004 D.C.App. Lexis 384 at *10 (citation omitted).

While we have considered previously whether trial courts have abused their discretion in excluding expert psychological testimony on the reliability of eyewitness identifications, including "unconscious transference and photo-biased identifications," *see Green, supra,* 718 A.2d at 1050–51, 1053, we have not yet considered the precise issue presented in this case, whether a trial judge abuses his or her discretion in excluding proffered psychological expert testimony concerning the correlation between witness confidence and accuracy in eyewitness identifications. However, another jurisdiction has addressed a situation in which "the testimony of a 'psychological expert' [was proffered] for the purpose of explaining to the jury the factors that may influence the perception and memory of a witness and affect the reliability of identification testimony"; the court found no abuse of discretion in its exclusion, *People v. Lee,* 96 N.Y.2d 157, 726 N.Y.S.2d 361, 750 N.E.2d 63, 65 (2001). There, "[t]he expert also would testify about the absence of correlation between eyewitness confidence and the accuracy of an identification." *Id.* at 66. In reaching its decision, the New York Court of Appeals first pointed out that:

Despite the fact that jurors may be familiar from their own experience with factors relevant to the reliability of eyewitness observation and identification, it cannot be said that psychological studies regarding the accuracy of an identification are within the ken of the typical juror. Moreover, in recognition that expert testimony of this nature

may involve novel scientific theories and techniques, a trial court may need to determine whether the proffered expert testimony is generally accepted by the relevant scientific community.

*Id.* at 66–67 (citations omitted).[14] Nevertheless, the appellate court declared that the trial court did not abuse its discretion by excluding the expert testimony since "[it] was in a position to weigh the request against other relevant factors, such as the centrality of the identification issue and the existence of corroborating evidence," and did so. *People v. Lee,* at 67. Similarly, in *United States v. Lumpkin,* 192 F.3d 280 (2d Cir.1999), appellant "sought to offer testimony from his expert witness ... that the degree of confidence a witness purports to have in his or her identification does not correlate to the accuracy of that identification." *Id.* at 288. The court applied the legal principle that "[a] decision to exclude expert testimony rests soundly with the discretion of the trial court and shall be sustained unless 'manifestly erroneous,' " and held: "[T]he trial court committed no error when it decided to exclude [the expert's] testimony on witness confidence in identifications." *Id.* at 289.

Our decision in *Dyas, supra,* follows an approach similar to that of the court in *Lee, supra.* As *Green, supra,* indicates, we follow a three-prong test articulated in *Dyas* in evaluating the admissibility of expert testimony:

(1) the subject matter "must be so distinctively related to some science, profession, business or occupation *as to be beyond the ken of the average layman*";
(2) "the witness must have sufficient skill, knowledge, or experience in that field or calling as to make it appear that his opinion or inference *will probably aid the trier in his search for truth*"; and (3) expert testimony is inadmissible if "the state of the pertinent art or scientific knowledge does not permit a reasonable opinion to be asserted even by an expert."

*Green, supra,* 718 A.2d at 1050 (citing *Dyas,* 376 A.2d at 832) (quoting E. Cleary, MCCORMICK ON EVIDENCE § 13, at 29–31 (2d ed. 1972)) (emphasis in original).[15]

Here, with respect to the first *Dyas* factor, the correlation between witness confidence and accuracy, as reflected in psychological studies authored by Dr. Fulero and others may well be beyond the ken of the average layperson, as the court concluded in *Lee, supra.*[16] But, as the trial court in this case pointed out, the

14. Although we are a *Frye* jurisdiction, our cases involving the admission of expert testimony have rested on the discretion of the trial judge, rather than on the admissibility of "novel scientific evidence." *See Frye v. United States,* 54 App. D.C. 46, 293 F. 1013 (1923); *see also* Scott Woller, Note, *Rethinking the Role of Expert Testimony Regarding the Reliability of Eyewitness Identifications in New York,* 48 N.Y.L. SCH. L. REV. 323 (2003/04).

15. *Frye, supra,* "has been linked to the third prong of the [*Dyas*] test." *See Drevenak v. Abendschein,* 773 A.2d 396, 418 n. 32 (D.C. 2001).

16. The trial court acknowledged that "other jurisdictions have permitted expert testimony on the correlation between the confidence of

a witness's identification and the accuracy of such identification." *See for example United States v. Harris,* 995 F.2d 532, 534–35 (4th Cir.1993) ("[T]here has been a trend in recent years to allow [expert psychological testimony on the validity of eyewitness identification] under circumstances described as 'narrow.' "); *United States v. Moore,* 786 F.2d 1308, 1312 (5th Cir.1986) ("This Court accepts the modern conclusion that the admission of expert testimony regarding eyewitness identifications is proper...."); *People v. McDonald,* 37 Cal.3d 351, 208 Cal.Rptr. 236, 690 P.2d 709, 721 (1984) ("[A]lthough jurors may not be totally unaware of the ... psychological factors bearing on eyewitness identification, the body of information now available on these matters is sufficiently beyond common experience that in appropriate cases expert opinion thereon could at least assist the

studies on which Dr. Fulero would have relied concern the reliability of a stranger identification, not an identification of a person known to the witness, as in this case. Thus, it is highly questionable on this record whether the existence or state of scientific knowledge in the area of psychological studies relating to the correlation between witness confidence and accuracy of non-stranger identifications would have permitted a reasonable opinion to be asserted by Dr. Fulero, and hence, as the trial court declared, it is also doubtful that Dr. Fulero's testimony would have been helpful to the jury. *See Green* and *Steele, supra.*

Equally important, in the instant case the government presented evidence corroborating Ms. Watkins' identification of Mr. Hager, and in cases where such corroboration of identification exists, the exclusion of the proffered expert testimony by the trial court generally does not constitute an abuse of discretion. *See Commonwealth v. Santoli,* 424 Mass. 837, 680 N.E.2d 1116, 1119 (1997) ("In a relatively small number of cases, the exclusion of expert testimony on eyewitness identification has been characterized as an abuse of discretion. The opinions that rule that the exclusion of the expert testimony was or may have been error are typically those where there was little or no evidence to corroborate the eyewitness identification.") (citations omitted). One piece of corroborating evidence in the case before us was pivotal. Two latent fingerprints, lifted from the magazine clip of the SWD 11,

matched those of Mr. Hager's right little finger. The SWD 11 was found in the living room of Mr. Robinson's apartment, and during the crimes, Mr. Parker had called Mr. Hager into the living room to help him with a struggling Mr. Robinson. Another aspect of the corroborating evidence consisted of statements made by Mr. Hager and Mr. Parker sometime after the murder of Mr. Robinson. Mr. Hager told Charles Johnson that he and Mr. Parker "went to go rob the Bama [apparently Mr. Robinson] and he bucked [refused to give them any money]." Lloyd Johnson, who had seen Mr. Parker with a .40 caliber Glock gun, maintained that sometime after the March 30, 1995 murder, he saw Mr. Hager and Mr. Parker talking, after which Mr. Hager told him that he "had killed a dude on Nelson Place ... [and consequently] ... he got rid of the Glock." Such corroborating evidence "undercuts the need, except in the most compelling cases, for expert testimony on eyewitness identifications." *United States v. Hall,* 165 F.3d 1095, 1107 (7th Cir.1999) (citations omitted).[17]

In short, we cannot say on this record that the trial court abused its discretion in excluding Dr. Fulero's expert testimony, or that such exclusion was "manifestly erroneous." *Green, supra,* 718 A.2d at 1053. The trial court clearly exercised its discretion and did not misapprehend the relevant principles. *See Johnson v. United States,* 398 A.2d 354 (D.C.1979). Before making its ruling it considered "relevant studies provided by the defendant on eye-

---

trier of fact.") (internal quotation marks omitted). Our own court has emphasized the case-specific nature of any determination of whether proffered expert testimony will assist the jury in evaluating an eyewitness identification." *Green,* 718 A.2d at 1051.

**17.** An additional factor supports the trial court's decision to exclude the testimony of Dr. Fulero. Mr. Hager had an opportunity to

cross-examine Lora Watkins and to attack her eyewitness identification testimony. As the court said in *Hall, supra,* "any weaknesses in eyewitness identification testimony ordinarily can be exposed through careful cross-examination of the eyewitnesses." *Id.* at 1107. Defense counsel's cross-examination of Ms. Watkins was quite rigorous and challenged not only her confidence but also her accuracy in the identification of Mr. Hager.

witness testimony; the transcripts of [Dr. Fulero's] expert testimony in a separate case . . . and the ruling of the trial court in that case on the admissibility of such testimony; [Ms. Watkins'] testimony in [Mr. Hager's] first trial in this case; and the relevant case law." In addition, other evidence was introduced corroborating Ms. Watkins' identification of Mr. Hager as an assailant.

### The Motion to Suppress on Sixth Amendment Grounds

 Mr. Hager contends that his constitutional Sixth Amendment right to counsel was violated by the admission of statements he made to government witness Lloyd Johnson while the two were confined in a courthouse holding cell. He argues that the statements, made in the absence of his counsel, in effect were deliberately elicited by the government through its "agent," Johnson. The government responds that no Sixth Amendment violation occurred because it had filed a written request to separate Mr. Johnson from Mr. Hager during their detention and hence it did not make a deliberate effort to elicit statements from Mr. Johnson that would implicate Mr. Hager in the murder of Mr. Robinson. In denying the motion to suppress, the trial court ruled:

> [T]he separation order was to keep Mr. Johnson away from Mr. Hager at all times during the trial, including transportation to and from the jail and the court, so I don't find that the Government placed Mr. Johnson in a position to hear Mr. Hager. Indeed the Government tried to keep him apart from Mr. Hager. So, I don't believe there was any government attempt to deliberately

elicit anything from Mr. Hager. So that there's no government action that needs to be punished by suppressing evidence. So the motion to suppress is denied.

 On review of the denial of a suppression motion, this court "will not disturb the trial court's factual findings unless they are clearly erroneous, and those findings will only be set aside if they lack substantial support in the record." *United States v. Turner,* 761 A.2d 845, 850 (D.C. 2000) (citing *Morris v. United States,* 728 A.2d 1210, 1215 (D.C.1999)) (internal quotation marks omitted). "We must accept the trial judge's findings of evidentiary fact and . . . resolution of conflicting testimony." *Brown v. United States,* 590 A.2d 1008, 1020 (D.C.1991). We review the record in the light most favorable to the government, which prevailed in the trial court. *Peay v. United States,* 597 A.2d 1318, 1320 (D.C.1991) (en banc).

To determine whether there has been a Sixth Amendment violation requiring the suppression of a defendant's statement, we look to applicable precedents decided by the Supreme Court of the United States, including *United States v. Henry,* 447 U.S. 264, 100 S.Ct. 2183, 65 L.Ed.2d 115 (1980) and *Massiah v. United States,* 377 U.S. 201, 84 S.Ct. 1199, 12 L.Ed.2d 246 (1964). *See Simpson v. United States,* 632 A.2d 374, 380 (D.C.1993). Our analysis in this case is controlled by what we said in *Simpson:* "Once formal criminal proceedings begin, the Sixth Amendment renders inadmissible in the prosecution's case in chief, statements 'deliberately elicited' from a defendant without an express waiver of the right to counsel." *Id.* at 380 (citations omitted).[18] Our review of the

---

18. *Massiah* articulated a three-prong test to determine whether a Sixth Amendment violation has been committed which requires suppression of a defendant's statement. The defendant "need[s] to show [(1)] that his right to counsel had attached, [(2)] that [the infor-

mant] was a government agent, and [(3)] that [the informant] deliberately elicited incriminating statements from [the defendant]." *Moore v. United States,* 178 F.3d 994, 999 (8th Cir.1999) (citing *Massiah, supra,* 377 U.S. at 206, 84 S.Ct. 1199).

record in this case satisfies us that the government did not deliberately elicit from Mr. Hager the statements implicating him in the murder of Mr. Robinson. To the contrary, the government sought to ensure Mr. Hager's separation from Mr. Johnson by requesting that the U.S. Marshal's service keep them apart "at all times" during the proceedings against Mr. Hager. Thus, Mr. Johnson was not a government agent within the meaning of *Massiah.* Moreover, we are bound by the trial court's factual finding that the government took steps to ensure no contact between the two men while Mr. Hager was awaiting trial and in trial. Mr. Hager knew Mr. Johnson was scheduled to testify against him but nevertheless initiated conversation with him in the holding cells at the courthouse the day before Mr. Johnson's testimony. Mr. Johnson testified that Mr. Hager "called out [his] name" and indicated that Mr. Johnson was scheduled to testify against him, not Mr. Parker. He asked Mr. Johnson to "do anything to mess the trial up" so that there would be a "mistrial or something like that." When Mr. Johnson asked whether Mr. Hager was with Mr. Parker at the time of the murder, Mr. Hager responded: "Yes, but I ain't telling you [anything]." On the return trip to the jail in a van, Mr. Hager told Mr. Johnson: "You know, it is all on you, champ. It's up to you. You could [mess] the whole trial up." In sum, the record supports the trial court's factual findings and legal conclusion that the government did not deliberately elicit incriminating statements from Mr. Hager; that is, the government did not "intentionally creat[e] a situation likely to induce [Mr. Hager] to make incriminating statements without the assistance of counsel," *Henry, supra,* 447 U.S. at 274, 100 S.Ct. 2183, and hence, the trial court properly denied the motion to suppress.

Finally, Mr. Hager maintains that "the carrying a pistol without a license statute

... unconstitutionally infringes upon the right to bear arms bestowed by the Second Amendment [to the Constitution]," as well as "violates the Fifth Amendment protections of due process and equal protection." The government claims that Mr. Hager waived both of these arguments. We agree. *See Mitchell v. United States,* 746 A.2d 877, 885 n. 11 (D.C.2000). At any rate, Mr. Hager's arguments are foreclosed by our decisions in *Austin v. United States,* 847 A.2d 391 (D.C.2004) (per curiam), and *Sandidge v. United States,* 520 A.2d 1057 (D.C.1987).

Accordingly, for the foregoing reasons, we affirm the judgment of the trial court.

*So ordered.*