**William WATSON, Appellant,**

v.

**UNITED STATES, Appellee.**

No. 08–CO–985.

District of Columbia Court of Appeals.

Argued June 5, 2012.
Decided May 23, 2013.

Jenifer Wicks, Washington, DC, for appellant.

Suzanne G. Curt, Assistant United States Attorney, with whom Ronald C. Machen Jr., United States Attorney, Roy W. McLeese III, Assistant United States Attorney at the time the brief was filed, and Kenneth F. Whitted and James Sweeney, Assistant United States Attorneys, were on the brief, for appellee.

Before GLICKMAN and EASTERLY, Associate Judges, and FARRELL, Senior Judge.

GLICKMAN, Associate Judge:

The question in this appeal is whether appellant William Watson's Sixth Amendment rights were violated at his trial by the introduction of incriminating statements he had made to a fellow jail inmate named Charles Bender. The answer turns on whether Bender was acting as the government's agent when he elicited appellant's statements. In a previous decision in this case, we remanded for the Superior Court to reconsider the issue in light of new information provided by the government.[1] After taking evidence, Judge Keary found that Bender was not a government agent and concluded that appellant's Sixth Amendment rights had not been infringed. We affirm the judge's ruling.

## I.

In July 1998, Charles Bender testified for the prosecution at appellant's trial for the fatal shooting of Tyrus "Mink" Hunt. Bender was then a cooperating witness in an unrelated law enforcement investigation who was awaiting sentencing in his own case: In November 1997, he had pleaded guilty in federal court to a RICO conspiracy in exchange for the dismissal of murder and other charges. Bender's plea agreement required him to "cooperate truthfully, completely, and forthrightly" with law enforcement authorities "in whatever form [the United States Attorney's Office] deems appropriate ... in any matter as to which the Government deems his coopera-

tion relevant." The agreement specified that "[t]he term 'whatever form' includes, but is not limited to, answering questions; ... giving testimony; ... and participating in covert law enforcement activities." The United States Attorney's Office agreed to bring Bender's cooperation to the court's attention at the time of his sentencing and, if the Office determined that Bender had "provided substantial assistance in the investigation or prosecution of another person who has committed any offense," to file the appropriate motion to enable Bender to request a below-Guidelines sentence.[2]

In the months preceding appellant's trial, both he and Bender were detained at the D.C. Jail. They were held in different cellblocks and apparently had no contact with each other. But as Bender testified at the trial, he encountered appellant in March 1998 while the two of them were waiting to be transported to court. Bender recognized appellant, whom he knew from his old neighborhood by the nickname "Champ," and struck up a conversation with him. Bender testified that he asked appellant why he was at the Jail, and appellant answered, "a body." "What body?" Bender asked. Appellant told Bender that the body was that of Mink, someone else Bender had known. Appellant proceeded to describe to Bender how and why he had shot and killed Mink. When defense counsel asked Bender why appellant was willing to confess the murder to him, Bender answered that appel-

1. *Watson v. United States (Watson I)*, 940 A.2d 182 (D.C.2008). Appellant initially asserted his claim of a Sixth Amendment violation in a new trial motion pursuant to D.C.Code § 23–110 (2001). The trial court denied the motion on the ground that Bender was not a government agent. While that ruling was on appeal, the government for the first time disclosed that one of its law enforcement agents had discussed appellant with Bender before Bend-

er spoke with appellant and obtained appellant's incriminating admissions. We deemed it necessary for the trial court to assess the import of this newly revealed information for appellant's claim.

2. Under the federal Sentencing Guidelines, Bender was facing a potential sentence of life imprisonment without parole.

lant thought he and Bender were "cool" and did not "know how I was thinking."

Bender promptly reported appellant's confession to Kristen Ashby, the FBI Special Agent he had been debriefing in accordance with his plea agreement. Ashby passed the information on to the Assistant United States Attorney who was prosecuting the case against appellant.

Bender acknowledged in his testimony that his plea agreement committed him to cooperate with law enforcement about "any crime" he knew about. He insisted, though, that the government had not asked him to question appellant and that he had acted on his own initiative in doing so:

> [T]he government didn't come to me about this. No, I came to them. They didn't ask me nothing about [appellant]. I came to them on my own.... They didn't ask nothing about Champ's [appellant's] case.... I didn't think it mattered, but I just did it on my own.[3]

Special Agent Ashby testified at the hearing held on remand following our decision in *Watson I*. Ashby explained that she was assigned to work with Bender when he began cooperating in August 1997 with a federal investigation of narcotics trafficking and violent crime in the Greenleaf Gardens area of Southwest Washington, D.C. (Ashby referred to this at the hearing as the "Southwest crew" investigation.) Over the next six months, Bender participated in a series of debriefings with Ashby and federal prosecutors,[4] entered into his November plea agreement, and eventually testified before a grand jury in February 1998.[5]

Bender's debriefings and grand jury testimony focused on the persons and activities targeted in the Southwest crew investigation. Appellant was not a target of that investigation, but when Bender was asked in his first debriefing on August 13, 1997, to tell about any violent crimes he had witnessed, he disclosed that he had seen "Champ" kill someone named Shawn in the summer of 1995 in the James Creek area of Southwest D.C. Bender told Ashby that Champ, whose real name he did not know, recently had been jailed for another homicide in which someone named Mink had been killed. The two incidents involving Champ (i.e., appellant) were outside the purview of the Southwest crew investigation, so Ashby passed the information on to D.C. homicide detectives. She did not know what use (if any) they made of it.

Ashby testified that she had no further discussion with Bender concerning appellant until March 1998 when he reported the encounter during which appellant told Bender he had killed Mink. Ashby confirmed what Bender had said at appellant's trial, that the government had not asked him to talk to appellant or obtain information from or about him.

Nor, according to Ashby, did the government ever ask Bender to get information from anyone else. For his own safety, Bender was instructed to avoid contact

---

3. Again, when the prosecutor asked Bender on redirect examination what he meant by saying he came to the government on his own, Bender responded:

> Well, I told you all what I knew. You all didn't come to me and [ask me to] find out if Champ would tell you this or tell you that. I came to you all and said: Well, look, you know, that's what happened. I was on my own, you know.

4. Our opinion in *Watson I* erred in stating that Bender's debriefings started in 1995. 940 A.2d at 185–86.

5. Bender subsequently testified for the prosecution at a trial (the "K Street Trial") in federal district court. *See Watson I*, 940 A.2d at 185.

with individuals who were subjects of the Southwest crew investigation.[6] However, that was not always possible. On October 7, 1997, Bender happened to be going downtown for another debriefing session with the government when, by chance, he encountered "Draper," who had been brought from Maryland (where he was incarcerated) for an appearance in Superior Court on some misdemeanor charges. The two men knew each other. They conversed while being detained temporarily in the cellblock, and Draper made admissions relating to certain homicides. The record does not disclose who initiated their conversation or whether Bender prompted Draper's incriminating comments. Bender reported Draper's statements to Ashby when he met with her later the same day.[7] So far as the record indicates, this was the only time Bender relayed information to Ashby that he acquired while he was cooperating with the government (other than in March 1998 when he related appellant's admissions).[8]

**6.** Bender was not directed to refrain from talking to other D.C. Jail inmates, but neither was he asked by the government to get information from them.

**7.** Ashby was distressed to learn that Bender had been in contact with Draper. As she testified, "[i]t was upsetting to me personally as a person who was working with various cooperators, including Mr. Bender, for them to have any contact with the defendants in this Southwest crew investigation [because] I was in fear for their safety.... [S]everal of the defendants ... had shown a pattern of witness intimidation and also killing witnesses.... I believe that if Draper had any belief that Mr. Bender was cooperating, Mr. Bender's—his life could have been—he would—it would have been a safety concern."

**8.** According to Ashby, Bender reported having had a conversation at the D.C. Jail with another target of the investigation at some point after he began his debriefings. The substance of this conversation was not divulged at the hearing on remand.

## II.

Appellant's Sixth Amendment right to the assistance of counsel in connection with his indictment for the murder of Tyrus Hunt attached long before Bender elicited his confession to that murder. Appellant did not knowingly waive that right. Therefore, if Bender procured appellant's admissions at the government's behest—if he was acting as the government's agent—then appellant's Sixth Amendment right was violated by the introduction of his confession at trial.[9] If, on the other hand, Bender questioned appellant about the Hunt murder "on his own initiative" and not pursuant to governmental direction or orchestration, there was no constitutional violation—even if Bender's purpose in procuring appellant's admissions was to convey them to the government in order to secure favorable treatment (a lenient sentence) for himself.[10]

Crediting the testimony of Bender and Special Agent Ashby, which was un-

**9.** *See, e.g., Watson I,* 940 A.2d at 185 ("[T]he Sixth Amendment is violated when government agents expressly or implicitly use an informant as their agent to take some deliberate action, beyond mere passive listening, to elicit incriminating statements from a person whose right to counsel has attached."); *United States v. Birbal,* 113 F.3d 342, 345 (2d Cir.1997) ("The Sixth Amendment bars the government from planting an agent to elicit jailhouse admissions from an indicted defendant who has asserted his right to counsel.").

**10.** *Watson I,* 940 A.2d at 185; *see also, e.g., Birbal,* 113 F.3d at 346 ("The Sixth Amendment rights of a talkative inmate are not violated when a jailmate acts in an entrepreneurial way to seek information of potential value, without having been deputized by the government to question that defendant."); *United States v. (Kevin) Watson,* 894 F.2d 1345, 1347–48 (D.C.Cir.1990) (agreeing with other circuits that Sixth Amendment protection does not extend to "situations where an individual, acting on his own initiative, deliberately elicits incriminating information," even if he "hoped to make a sale" of that in-

controverted, Judge Keary found that Bender was not a government agent when he talked to appellant. The record amply supports that finding.[11] The fact that Bender was a government informant in the Southwest crew investigation and had agreed to cooperate with law enforcement in exchange for the prospect of a lenient sentence is not enough to show that he was acting as the government's covert agent when he spoke to appellant. Ordinarily, "an informant becomes a government agent for purposes of [the Sixth Amendment right at issue here] only when the informant has been instructed by the police to get information about the particular defendant."[12] There was no such overt instruction here—Bender was never asked to obtain information from or about appellant. Nor did Bender's government interlocutors signal a desire for Bender to do so by showing great interest in learning more about appellant, for "Champ" and his alleged crimes were not the focus of the Southwest crew investigation. Moreover, the government did not intentionally create or "knowingly exploit" an opportunity to circumvent appellant's right to the assistance of counsel.[13] The government did not arrange for Bender to meet appellant and had no reason to expect their meeting to occur; the encounter was unforeseen and inadvertent.[14] This is not a case

formation to the government) (internal quotation marks omitted).

11. We defer to the trial court's factual findings unless they are clearly erroneous; the legal merit of appellant's Sixth Amendment claim in light of those findings is subject to our *de novo* review. *See Hager v. United States*, 856 A.2d 1143, 1150–51 (D.C.2004) (upholding "the trial court's factual findings and legal conclusion that the government did not deliberately elicit incriminating statements from" a defendant in violation of his Sixth Amendment rights).

12. *Birbal*, 113 F.3d at 346 (citing cases). This does not "mean that the government can send an informant on a reconnaissance patrol through the prison population to gather evidence as long as it does not target specific individuals for the informant's attentions[.] ... [T]he relevant question ... is whether the [government] told [the informant] to collect information, not whether it told him exactly *how* or *when* to collect it, or from *whom*." *United States v. York*, 933 F.2d 1343, 1356, 1358 (7th Cir.1991); *see also United States v. Sampol*, 636 F.2d 621, 638 (D.C.Cir.1980) (reversing for violation of the Sixth Amendment where "the government trolled in the jail, using [its cooperating informant] as bait, and was ready to net any unwary inmate who rose to the lure"); *but cf. United States v. LaBare*, 191 F.3d 60, 65 (1st Cir.1999) ("Where the government asks a jail mate to report incriminating statements by anyone but has in no way focused the jail mate's attention on an individual defendant, it is a stretch to describe the jail mate's inquiries of the defendant as 'government interrogation.'"). In the present case, the government never asked Bender to embark on an open-ended fishing expedition in the D.C. Jail to collect incriminating evidence from any inmate he could hook. And as we discuss below, the government did not sanction such a mission implicitly.

13. *Maine v. Moulton*, 474 U.S. 159, 176, 106 S.Ct. 477, 88 L.Ed.2d 481 (1985) ("[K]nowing exploitation by the State of an opportunity to confront the accused without counsel being present is as much a breach of the State's obligation not to circumvent the right to the assistance of counsel as is the intentional creation of such an opportunity.").

14. *Cf. Ayers v. Hudson*, 623 F.3d 301, 310 (6th Cir.2010) (holding that "the State 'intentionally creat[ed] a situation likely to induce [Ayers] to make incriminating statements without the assistance of counsel,'" in violation of his Sixth Amendment rights, "when it returned Hutchinson [a police informant] to Ayers' jail pod and he thereafter deliberately elicited" incriminating admissions from Ayers) (quoting *United States v. Henry*, 447 U.S. 264, 274, 100 S.Ct. 2183, 65 L.Ed.2d 115 (1980)); *Randolph v. California*, 380 F.3d 1133, 1144 (9th Cir.2004) (holding that an informant was a government agent when he was placed in the defendant's jail cell after he indicated his willingness to testify against the defendant, be-

where the government " 'must have known' that its agent was likely to obtain incriminating statements from the accused in the absence of counsel." [15]

■ We recognize that an agency agreement between an informant and the government need not be formal or explicit but may be "inferred from evidence that the parties behaved as though there were an agreement between them, following a particular course of conduct over a sustained period of time." [16] Invoking that proposition, appellant contends a "symbiotic relationship[ ]" evolved following Bender's "initial exercise of initiative" [17] in reporting the incriminating admissions made to him by Draper. There were no adverse consequences for Bender, appellant argues, even though the government had instructed him to avoid contact with any targets of the Southwest crew investigation; rather, the government accepted the information Bender furnished and continued to hold him at the Jail, where he could have additional interactions with investigation targets and other inmates who might make admissions. Appellant argues that the government thereby "implicitly directed" Bender to collect information from fellow prisoners if the opportunity presented itself. [18] The possibility held out in his plea agreement of being rewarded with a lenient sentence supplied ample incentive for Bender to take the hint and exert himself to do the government's tacit bidding.

We think appellant extrapolates too much from too little. For one thing, it is by no means clear that Bender could have avoided conversing with Draper—at least not without drawing suspicion upon himself—when the two men met by chance. It also is not clear that Bender prompted Draper's incriminating admissions. In any event, the government had told Bender to avoid contact with targets of the investigation, and it never countermanded that instruction. It did not reward Bender for obtaining Draper's admissions or encourage him to repeat such activities, and it did nothing to help Bender gather information from his fellow inmates. It hardly would have been feasible for the government to isolate Bender from all contact with other detainees, nor was the government required to take such a drastic step in order to avoid making Bender its undercover operative. Even if Bender might have been inclined to undertake the risk of a covert operation, it was contrary to the government's interest in his self-preservation for him to do so. And in fact, no pattern of information-gathering behavior by Bender emerged in the aftermath of his encounter with Draper. Neither he nor the government acted as if he had been deputized to procure incriminating information from anyone. We conclude that the government did not bid Bender, implicitly or otherwise, to engage in freelance investigative sorties on its behalf, nor did the government acquiesce in his doing so. This case falls squarely within the category of cases, such as *Birbal* and *(Kevin) Watson*, [19] in which the inmate acted on his

cause "it is not the government's intent or overt acts that are important; rather, it is the likely result of the government's acts" that matters) (internal quotation marks and ellipsis omitted).

**15.** *Moulton,* 474 U.S. at 176 n. 12, 106 S.Ct. 477 (quoting *Henry,* 447 U.S. at 271, 100 S.Ct. 2183).

**16.** *York,* 933 F.2d at 1357.

**17.** *Id.*

**18.** Brief for Appellant at 1.

**19.** *See* footnote 10, *supra.*

own accord to elicit admissions from an unwary fellow detainee.

For the foregoing reasons, we find no violation of appellant's Sixth Amendment rights in the admission of Bender's testimony at his trial, and we affirm the judgment of the Superior Court.

*So ordered.*