*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

**DISTRICT OF COLUMBIA COURT OF APPEALS**

Nos. 18-CF-0686 & 25-CO-0349

JOSEPH MINOR, APPELLANT,

v.

UNITED STATES, APPELLEE.

Appeal from the Superior Court
of the District of Columbia
(2015-CF1-000057)

(Judith Bartnoff, *Judge*)
(Craig Iscoe, *Judge*)

(Argued March 12, 2026                    Decided June 25, 2026)

*Cody M. Akins*, with whom *Jeffrey T. Green*, *Daniel J. Hay*, *Lillian F. Holmes*, *Avery D. Gerdes*, and *Gregory Jacobs*, of the bar of the State of New York, *pro hac vice*, by special leave of court, were on the brief for appellant.

*Michael E. McGovern*, Assistant United States Attorney, with whom *Jeanine Ferris Pirro*, United States Attorney, and *Chrisellen R. Kolb*, *Eliot A. Folsom*, *John P. Mannarino*, and *Lindsey Merikas*, Assistant United States Attorneys, were on the brief for appellee.

Before BLACKBURNE-RIGSBY, *Chief Judge*, BECKWITH, *Associate Judge*, and WASHINGTON, *Senior Judge.*

BLACKBURNE-RIGSBY, *Chief Judge*: Appellant Joseph Minor appeals his

conviction for the first-degree murder while armed of Gregory Lee and related

counts and the denial of his D.C. Code § 23-110 motion for a new trial. In his direct appeal, Mr. Minor contends that the trial court plainly erred by failing to sua sponte exclude Mr. Lee's statements made before the shooting that Mr. Minor now argues were inadmissible hearsay and by instructing the jury that it could find Mr. Minor guilty of assaulting an eyewitness to the shooting if it found that he had aided and abetted in the commission of the assault. In his Section 23-110 appeal, Mr. Minor argues that the court erred in rejecting his claim that his trial counsel was ineffective because he failed to put on evidence from an expert in eyewitness identification, even though an eyewitness's identification of Mr. Minor was central to the government's case.

We affirm Mr. Minor's convictions and affirm the denial of his Section 23-110 motion.

## I.  Factual Background and Procedural History

### A.  The Shooting and Police Investigation

Trial testimony demonstrated the following. On December 14, 2014, Davon Hungerford and his friend, Gregory Lee, were standing in a back alley in the Barry Farms neighborhood. Mr. Lee walked further down the alley and out of sight, while Mr. Hungerford stayed behind. When Mr. Lee returned, Mr. Hungerford saw that he was arguing loudly with two men. Mr. Hungerford identified the two men as

Maurice Blakey and Joseph Minor, based on their general appearance, gait, and the sound of their voices. Mr. Hungerford grew up in the same neighborhood as Mr. Blakey and Mr. Minor and had known them for more than ten years.

When Mr. Hungerford stepped towards the three men to defuse the situation, Mr. Blakey took out a shotgun from underneath his coat and fired multiple shots at Mr. Hungerford. At the same time, Mr. Hungerford saw Mr. Minor point a handgun at Mr. Lee. Mr. Hungerford was unable to say whether Mr. Minor or Mr. Blakey shot first, but he stated that he saw Mr. Blakey fire the shotgun at him and, after briefly standing in shock, Mr. Hungerford ran back down the alley. Mr. Hungerford stated that while he was running, he saw Mr. Lee attempting to run up the steps towards his girlfriend's house. Mr. Hungerford saw Mr. Lee's body "jerk[]" at least twice as he was shot and then saw him fall to the ground on the steps. Mr. Hungerford was unable to provide an exact number of shots fired, but he approximated that he heard between four or five handgun shots and two or three shotgun shots. An autopsy later determined that Mr. Lee's death was due to gunshot wounds to his torso and extremities.

The police recovered three .380-caliber (handgun) cartridge cases from the steps where Mr. Lee's body was discovered, as well as five shotgun shells in the alley. Initially, Mr. Hungerford told police that he did not see the shooting, but he

later admitted that he was there and provided statements of what he had seen and the identities of the shooters. Mr. Hungerford further identified photographs of both Mr. Minor and Mr. Blakey as the shooters. Police recovered a loaded Mossberg 12-gauge, pump-action shotgun with Mr. Blakey's DNA on it from Mr. Blakey's apartment. Ballistics analysis connected the shells recovered from the crime scene to the shotgun.

Police also received information concerning the shooting from Allen Culver, who shared a jail cell with Mr. Minor and previously knew him from the Barry Farms neighborhood. While awaiting trial for an unrelated murder, Mr. Culver had begun cooperating with the government in hopes of receiving a recommendation for a lesser sentence in his own case. Mr. Culver informed police that Mr. Minor confessed to murdering Mr. Lee and that the shooting had been prompted by Mr. Minor's earlier unsuccessful robbery of Mr. Lee during a craps game, which ended in Mr. Minor shooting at Mr. Lee. According to Mr. Culver, on the night of the murder, Mr. Minor armed himself with a .380 handgun and went with Mr. Blakey, who was armed with a semiautomatic pump shotgun, to preemptively seek out Mr. Lee.[1] Mr. Culver also spoke to Mr. Blakey when the two men were

---

[1] Police also secured audio and video recordings of conversations between Mr. Minor and others while he was in jail, in which Mr. Minor expressed concern that Mr. Culver had "snitched" on him based on information that "only certain

placed together in a bullpen at the main D.C. jail, where Mr. Blakey told Mr. Culver that it was not his idea to kill Mr. Lee but that Mr. Minor wanted to, and "[s]o he rode with him" because Mr. Minor "was his brother."

## B. The Trial

Mr. Minor[2] was charged with the armed, premeditated, first-degree murder of Mr. Lee (count one); possession of a firearm during a crime of violence (PFCV) relating to the murder (count two); armed assault with intent to kill Mr. Hungerford (AWIKWA) (count three); PFCV relating to the assault on Mr. Hungerford (count four); and unlawful possession of a firearm after a prior crime-of-violence conviction (count five). Following a trial, a jury found Mr. Minor guilty on all counts, but under count three, it found him guilty of a lesser-included offense of AWIKWA—assault of Mr. Hungerford with a dangerous weapon. Judge Judith

---

people could have said" and Mr. Minor was shown making the "mouth zipped" gesture and mouthing "say nothing" to his girlfriend after she was subpoenaed in connection with his case.

[2] Mr. Minor was the sole defendant at trial. Prior to trial, Mr. Blakey pleaded guilty to murder in an unrelated case. In connection with that plea, which also resolved criminal charges related to Mr. Lee's murder and Mr. Hungerford's assault, Mr. Blakey provided a detailed proffer of the facts related to both cases. Mr. Blakey's proffer included that he was present when an unnamed accomplice, who was armed with a semiautomatic pistol, shot Mr. Lee. Mr. Blakey also admitted to aiding and abetting Mr. Lee's murder by firing a shotgun at Mr. Hungerford. This proffer was not introduced at Mr. Minor's trial.

Bartnoff sentenced Mr. Minor to an aggregate forty-seven-year prison term. Mr. Minor timely filed an appeal.

### C. The § 23-110 Motion Hearing and Order

On September 29, 2023, Mr. Minor filed a motion for a new trial pursuant to D.C. Code § 23-110, arguing that the representation provided by his trial counsel, Archie Nichols, constituted insufficient, prejudicial performance because he had failed to investigate whether to call an expert in eyewitness identification. A hearing was held before Judge Craig Iscoe, a different judge than the judge who had presided over Mr. Minor's trial.

In the Section 23-110 hearing, Mr. Minor did not take the stand himself or call Mr. Nichols as a witness.[3] Rather, Mr. Minor offered his affidavit, stating that Mr. Nichols never spoke to him about calling an eyewitness expert. He also called Dr. Margaret Kovera, who was qualified before the motions court as an expert in eyewitness identifications and the psychology of juries—over the government's opposition. Dr. Kovera's testimony expounded on her expert report, in which she concluded that "there were factors present in this case that could have adversely

---

[3] Initially the government intended to call Mr. Nichols as a witness but had difficulty securing his appearance. The government determined that it did not need to call him, and so it presented no witnesses at the hearing.

affected the witnesses' abilities to make a correct identification" and that "jurors' evaluations of eyewitness identification accuracy and ultimately the jury's verdict were unlikely to reflect knowledge of these factors." The government's impeachment strategy of Dr. Kovera largely focused on the inapplicability of the stranger-identification research on which she relied to come to her conclusions and the insufficiency of the three familiar-persons identification studies she referenced. Dr. Kovera acknowledged that the literature on familiar-person identifications was scant compared to stranger-identification research, and she indicated that Mr. Hungerford and Mr. Minor "know each other better than strangers," describing their level of familiarity as "casual" and "acquaintances from the neighborhood." The government also questioned Dr. Kovera about the relevance of her conclusions given that the identification at issue in Mr. Minor's case was based on non-facial identifications, i.e., voice, gait, and general appearance.

The court denied Mr. Minor's new trial motion, finding that Mr. Minor had not met his burden to show deficient performance by his trial counsel. The court reasoned that Mr. Minor's affidavit alone was not sufficient to meet this burden for several reasons. First, the court explained that the affidavit constituted inadmissible hearsay, as Mr. Minor did not testify at the hearing, and could not be "rel[ied] on" to meet Mr. Minor's burden. Second, the affidavit was insufficient proof of Mr. Minor's attorney's ineffectiveness because Mr. Minor lacked personal

knowledge of the full extent of Mr. Nichols's trial preparations and thus was unable to credibly attest, based solely on their conversations, that Mr. Nichols had not explored calling an eyewitness identification expert. The court also decided that, even if Mr. Minor had shown that Mr. Nichols had failed to explore calling an expert, considering the familiarity between Mr. Hungerford and Mr. Minor as well as the corroborating evidence showing the reliability of Mr. Hungerford's identification, Mr. Nichols could have made a reasonable strategic decision to focus on other lines of defense.

Additionally, the court ruled that Mr. Minor failed to show that he was prejudiced, even if it accepted Mr. Minor's theory of ineffectiveness, because there was not a reasonable probability that the trial judge would have admitted the testimony of a stranger-eyewitness identification expert at trial under D.C.'s incorporation of the Federal Rules of Evidence 702 and 403. Specifically, the court found that Dr. Kovera's testimony failed to satisfy the "helpfulness" requirements of Rule 702(a) because "[t]he bulk of Dr. Kovera's academic knowledge relate[d] to eyewitnesses identifying strangers, as opposed to identifying familiar persons"—indeed, only three of the forty-one studies she referenced in her report related to familiar-person identifications, and the court found these three insufficient in and of themselves. The court also had concerns that Dr. Kovera would not have been able to meet the reliable application of methodology requirements of Rule 702(d) given

her testimony that her interpretation of one of the three studies that concerned familiar-identifications was biased by her personal experience. Finally, on Rule 403, the court found that Dr. Kovera's testimony would have been excluded for having "little to offer jurors regarding familiar identifications and [for] pos[ing] a significant risk of confusing jurors between stranger- and familiar-identification science."

## II. Discussion

## A. The Section 23-110 Claim

Both parties focus their attention on Mr. Minor's appeal of his motion for a new trial pursuant to D.C. Code § 23-110, so we begin our review there.

## 1. Standard of Review

In considering the denial of a Section 23-110 motion alleging ineffective assistance of counsel, this court considers "the trial court's determination whether counsel was ineffective" as "a mixed question of law and fact." *Derrington v. United States*, 681 A.2d 1125, 1132 (D.C. 1996) (quoting *Byrd v. United States*, 614 A.2d 25, 30 (D.C. 1992)); *see also Turner v. United States*, 116 A.3d 894, 934 (D.C. 2015). This court will accept the trial court "judge's findings of fact unless they lack evidentiary support" and will "review the judge's legal conclusions *de novo*." *Turner*, 116 A.3d at 934. Under *Strickland v. Washington*, 466 U.S. 668 (1984), a

defendant can establish a claim for ineffective assistance of counsel by showing (1) that counsel's performance was deficient such that it fell outside of the range of "reasonable professional assistance" and (2) that "the deficient performance prejudiced the defense" such that the defendant was deprived of a fair trial. 466 U.S. 668, 687, 689 (1984). And while this court "defer[s] to the trial court's factual determinations unless they are unsupported by the record, its ultimate deficiency and prejudice determinations are legal in nature and are reviewed de novo." *Dugger v. United States*, 295 A.3d 1102, 1111 (D.C. 2023).

To determine whether a defendant's trial counsel was deficient, we ask whether the counsel's performance fell below professional norms. *See (Christie Carolyn) Jones v. United States*, 262 A.3d 1114, 1124 (D.C. 2021). This court has previously held that "professional norms require counsel, when appropriate, to explore calling an expert witness," as assessed by the "operative question . . . [of] whether expert testimony would 'help the trier of fact to understand the evidence or determine a fact in issue.'" *Id.* at 1124-25 (quoting *Motorola Inc. v. Murray*, 147 A.3d 751, 756-57 (D.C. 2016) (en banc)); *see e.g.*, *Kigozi v. United States*, 55 A.3d 643, 654 (D.C. 2012) (finding counsel's trial performance deficient because failing to secure an expert witness who could testify to the PCP intoxication of the decedent, whose dying declarations were central to government's case, "was patently unreasonable and fell below what is expected of competent counsel"); *(Ronald)*

*Young v. United States*, 56 A.3d 1184, 1187, 1194-95 (D.C. 2012) (concluding that trial counsel's failure to consult with and call an expert on narcotics to challenge officers' accounts of a drug transaction, which were central to the government's case, fell below the norms of professional standards).

## 2. Analysis

Because the record lacks a sufficient evidentiary foundation on which to conclude that Mr. Minor's trial counsel failed to consider calling an expert on eyewitness identification, we hold that Mr. Minor has failed to meet his burden of showing deficient performance. Mr. Minor's sole support for his contention that Mr. Nichols never considered calling an expert comes from his affidavit, which the court determined at the hearing was inadmissible hearsay. But even taking the affidavit at face value, Mr. Minor can only attest that, "Mr. Nichols never discussed with [him] the possibility of calling an eyewitness expert to rebut Mr. Hungerford's expected testimony[,]" and "[t]o [his] knowledge, Mr. Nichols never investigated, or even considered investigating, whether an eyewitness expert's testimony would have aided [his] defense at trial." Without more, Mr. Minor cannot discount considerations and investigations that Mr. Nichols might have conducted that were outside of Mr. Minor's knowledge, nor can he show that Mr. Nichols had no

strategic basis for deciding against calling such a witness.[4] Given our past skepticism in prior cases regarding the value of stranger identification testimony in circumstances in which the witness knew the person in question, we cannot say that it would have been deficient for Mr. Nichols to have considered but ultimately have decided against calling an expert witness on stranger identification in Mr. Minor's case. We have never imposed, and do not do so here, "a *per se* rule that there can be no prejudice in excluding expert testimony regarding eyewitness reliability if the eyewitnesses knew the person they identified." *Heath v. United States*, 26 A.3d 266, 282 n.53 (D.C. 2011). Rather, we have held that "[i]n light of more recent

---

[4] Mr. Minor's argument that his trial counsel was deficient relies heavily upon *Jones v. United States*, in which this court vacated the appellant's convictions and remanded for a new trial based on Ms. Jones's trial counsel's ineffectiveness in failing to call an expert on eyewitness identification. 262 A.3d at 1129-30. Yet, *Jones* is distinguishable from this case in many key respects—most significantly because the two eyewitnesses at the heart of the government's case lacked familiarity with Ms. Jones and inconsistently described her appearance. *Id.* at 1118-20 & n.4. Conversely, in *Parker v. United States*, 249 A.3d 388 (D.C. 2021), on which Mr. Minor also relies, we concluded that the trial court had properly excluded testimony from a stranger-identification expert because the eyewitness had "seen appellant Parker 'around the neighborhood more than ten times' and appellant Jenkins '[p]retty much every day,' which allowed the trial court to conclude the witness and appellants were 'not strangers to each other'" and that "the proffered expert testimony [on stranger identifications] would not aid the jury in any meaningful way." 249 A.3d 388, 402 (D.C. 2021). The court here found that "Mr. Hungerford was at least as familiar with Defendant Minor as was the witness in *Parker* with Defendant Parker" based on established facts in the record such as that: the two men had known each other for approximately seventeen years, knew each other by their nicknames, and would usually greet one another when they saw each other around the neighborhood. *See id.*

developments in the scientific community . . . in-depth consideration of such proffers will be necessary before rejecting [eyewitness identification] expert evidence," such that the trial court must "give individualized consideration to the defense's proffer in the context of the facts in [the particular] case." *Russell v. United States*, 17 A.3d 581, 588 (D.C. 2011); *see also Hager v. United States*, 856 A.2d 1143, 1148-49 (D.C. 2004) (holding that because "the studies on which [the expert witness] would have relied concern the reliability of a stranger identification, not an identification of a person known to the witness," it was "highly questionable . . . whether the existence or state of scientific knowledge in th[is] area . . . would have permitted a reasonable opinion to be asserted" or that "[the expert's] testimony would have been helpful to the jury").

Because we conclude that Mr. Minor has not met his burden under *Strickland*'s deficiency prong, we do not need to reach the prejudice prong.

## B. Direct Appeal: The Hearsay Claim

In his direct appeal, Mr. Minor alleges that the trial court admitted inadmissible hearsay by failing to sua sponte exclude Mr. Hungerford's testimony that Mr. Lee had told him about a prior altercation between himself and Mr. Minor

shortly before his murder.[5] We hold that Mr. Minor has failed to show plain error or that his substantial rights were affected, and thus affirm.

### 1. Standard of Review

When a claim is not properly preserved through a timely objection "made with reasonable specificity" on appeal, it is "subject to the strictures of 'plain error' review." *Comford v. United States*, 947 A.2d 1181, 1186 (D.C. 2008) (first quoting *Hunter v. United States*, 606 A.2d 139, 144 (D.C. 1992); and then quoting *Thomas v. United States*, 914 A.2d 1, 8 (D.C. 2006)). Under the four-part test for plain error, an appellant must demonstrate: (1) there was an error, (2) the error was "plain," (3) the error "affected his substantial rights," and (4) the error "seriously affect[ed] the fairness, integrity, or public reputation of judicial proceedings." *Little v. United States*, 989 A.2d 1096, 1100 (D.C. 2010) (first citing *United States v. Olano*, 507 U.S. 725, 732 (1993); and then quoting *Johnson v. United States*, 520 U.S. 461, 468 (1997)); *see also Robin v. United States*, 344 A.3d 1276, 1284 (D.C. 2025). Further, "[i]n order for a plain error to 'affect substantial rights,' the error must be of such a character 'that viewed in the context of the trial, there is a reasonable probability that

---

[5] While the record indicates that Mr. Minor's trial counsel "ha[d] a problem with" Mr. Hungerford testifying to Mr. Lee's statements about a bad interaction, at oral argument, Mr. Minor conceded that his counsel "did not . . . object to this error at trial," and both parties agree that this claim of error should be subjected to plain error review.

but for the error the factfinder would have had a reasonable doubt respecting guilt.'" *Portillo v. United States*, 62 A.3d 1243, 1259 (D.C. 2013) (quoting *Wheeler v. United States*, 930 A.2d 232, 245 (D.C. 2007)).

Our rules concerning hearsay follow the Federal Rules of Evidence in generally precluding the admission of hearsay as an "out-of-court statement offered in evidence to prove the truth of the matter asserted," and in allowing for certain exceptions that permit its admission in some circumstances. *Grimes v. United States*, 252 A.3d 901, 914 (D.C. 2021) (quoting *(Robert C.) Young v. United States*, 63 A.3d 1033, 1044 (D.C. 2013)); *see Smith v. United States*, 26 A.3d 248, 260 (D.C. 2011) ("While this jurisdiction has not adopted the Federal Rules of Evidence, this court will look to those rules for guidance." (quoting *Goon v. Gee Kung Tong, Inc.*, 544 A.2d 277, 280 n.9 (D.C. 1988))); *see also* Fed. R. Evid. 801(c) (setting forth a two-part definition of hearsay as "a statement that: (1) the declarant does not make while testifying at the current trial or hearing; and (2) a party offers in evidence to prove the truth of the matter asserted in the statement"). However, "[s]tatements that are not offered at trial to prove the truth of the matter asserted are not hearsay." *(Damion M.) Jones v. United States*, 17 A.3d 628, 632 (D.C. 2011) (citing *Mercer v. United States*, 864 A.2d 110, 118 (D.C. 2004)). In our jurisdiction, the "state-of-mind"

hearsay exception[6] "permits the use of hearsay statements for the limited purpose of showing the state of mind of the declarant, *or of the listener*, including motive." *Evans-Reid v. District of Columbia*, 930 A.2d 930, 944 (D.C. 2007) (citation modified) (emphasis added) (first citing *Clark v. United States*, 412 A.2d 21, 28-30 (D.C. 1980); and then citing *In re C.D.*, 437 A.2d 171, 175 (D.C. 1981)).

## 2. Analysis

Mr. Minor argues that Mr. Lee's description of his earlier altercation with Mr. Minor—as recounted by Mr. Hungerford—could only be offered for the truth of the matter asserted, i.e., that Mr. Lee and Mr. Minor had in fact had an altercation prior to the murder. He further claims that the trial court's admission of the hearsay affected his substantial rights, such that, absent the hearsay, there was a "reasonable probability" of a different outcome because the government relied on the statement to establish Mr. Minor's motive to murder Mr. Lee.

---

[6] Federal Rule of Evidence 803(3) ("Then-Existing Mental, Emotional, or Physical Condition") only permits the admission of hearsay that is "[a] statement of *the declarant's* then-existing state of mind"—not the listener's state of mind. (emphasis added). As such, when a statement is offered not for the truth of the matter asserted but for its "effect on the listener," it is considered "not hearsay" under the Federal Rules, as opposed to an exception to the hearsay bar. Fed. R. Evid. 801(c). This court has previously stated that Federal Rule 803(3) is only "persuasive authority" in the court's "refining [of] our own common law state of mind exception," and has never been "expressly adopted." *Grimes*, 252 A.3d at 918 n.16.

Conversely, the government contends that Mr. Minor has failed to show that the testimony was plainly inadmissible under any of the exceptions to the hearsay rule and that Mr. Minor has failed the plain error test at its first step. The government further alleges that Mr. Hungerford's testimony was admissible to establish his knowledge of the ongoing animosity between his friend, Mr. Lee, and Mr. Minor to provide relevant context for: "(1) [Mr. Hungerford's] testimony that he was concerned about aggression between Minor and Lee when he saw them talking on another occasion before Lee's murder" and "(2) why he attempted to intervene and defuse the situation when he saw Lee arguing with Minor and Blakey on the night of Lee's murder . . . ."[7] Further, and contrary to Mr. Minor's contention, the government argues that it did *not* use Mr. Hungerford's statement about the identity of the person with whom Mr. Lee had had a bad interaction as the source of its evidence of motive to support its case; instead, the motive evidence came from two other government witnesses.

---

[7] The government acknowledged at oral argument that the "excited utterance" exception would not apply to this statement because there had been insufficient foundation laid, but it suggested that the government attorney was attempting to lay such foundation in order to utilize this hearsay exception if needed. *See generally Mayhand v. United States*, 127 A.3d 1198, 1205 (D.C. 2015) ("[T]he 'excited utterance' exception to the rule against hearsay is well established in this jurisdiction . . . .").

Even assuming it was error to admit this hearsay statement, Mr. Minor has not met his burden under our plain error standard because he has failed to show that any such error was "plain" or "affect[ed] his 'substantial rights.'" *Little*, 989 A.2d at 1100. Mr. Minor points to *Sims v. United States*, 213 A.3d 1260 (D.C. 2019), as a comparable situation in which this court held that inadmissible hearsay was prejudicial enough to require reversal; however, *Sims* concerned the "aggregate harm of the erroneous admission" of two hearsay statements—only one of which was objected to at trial, the other statement we reviewed for plain error—which were foundational to the government's case. *Id.* at 1266-72 & n.11. Here, unlike in *Sims*, the single hearsay statement was not foundational to the government's case, it was not objected to at trial, and the other evidence against Mr. Minor was strong.[8] Additionally, the hearsay statement at issue had another likely purpose besides being offered for the truth of the matter asserted—i.e., its effect on the listener,

---

[8] The overall reliability of Mr. Hungerford's testimony was corroborated by physical evidence, such as the shotgun casings recovered in the alley, the DNA on the shotgun that corroborated Mr. Hungerford's testimony that Mr. Blakey was the second shooter, the .380-caliber casings that police recovered near where Mr. Lee had been shot, and the location of Mr. Lee's body where Mr. Hungerford said it was. Further, Mr. Hungerford's testimony was corroborated by Mr. Culver, who, despite being incarcerated, having multiple criminal convictions including for murder, and being impeached with his bias towards the government based on the potential benefits he expected to receive in exchange for his cooperation, was nevertheless able to describe specific details of the night of the murder, which were also consistent with the physical evidence.

Mr. Hungerford—that the trial court could have determined was sufficient to allow the hearsay statement to be heard by the jury. The hearsay statement's impact was also significantly muted by Mr. Hungerford's subsequent testimony that, sometime between the recounted conversation with Mr. Lee and the night Mr. Lee was killed, Mr. Hungerford personally observed an "altercation" between Mr. Lee and Mr. Minor involving potentially "aggressi[ve]" "body language." This later testimony, based on the personal observation of the declarant, Mr. Hungerford, and not an out-of-court declarant, was plainly admissible and largely repetitive of the hearsay statement—neither of which were utilized by the government to establish motive.

Accordingly, even assuming that the admission of this hearsay statement was error, Mr. Minor has not demonstrated that any such error was plain or that there was a reasonable probability that, but for the purported error, the jury would have had a reasonable doubt respecting guilt, and so he does not overcome the plain error test.

### C. Direct Appeal: The Jury Instruction Claim

Mr. Minor also argues that the trial court committed plain error when it instructed the jury that it could convict Mr. Minor of PFCV under D.C. Code § 22-4504(b) if it found that he was either an accomplice to, or a co-conspirator with,

Mr. Blakey in his assault of Mr. Hungerford.[9] Instead, he argues, *only* the conspiracy instruction should have been issued to the jury because D.C. Code § 23-1331(4) does not permit aiding-and-abetting an assault as a crime of violence.[10] We are unpersuaded.

### 1. Standard of Review

As this issue concerns an unpreserved alleged trial error, it is subject to the plain error standard discussed above. *See Alleyne v. United States*, 327 A.3d 472, 483 (D.C. 2024). This court will reverse a conviction "[o]nly if all four prongs are met." *Id.* at 484 (quoting *Griffin v. United States*, 144 A.3d 34, 37 (D.C. 2016)). Questions of statutory interpretation are reviewed de novo, and, when interpreting a statutory test, "our analysis starts with the plain language of the statute and assumes that the intent of the lawmakers is to be found in the language that they used." *Flowers v. District of Columbia*, 343 A.3d 46, 52-53 (D.C. 2025) (citation modified)

---

[9] Under D.C. Code § 22-4504(b), "[n]o person shall within the District of Columbia possess a pistol, machine gun, shotgun, rifle, or any other firearm or imitation firearm while committing a crime of violence or dangerous crime as defined in § 22-4501." D.C. Code § 22-4501(1B) provides that "'[c]rime of violence' shall have the same meaning as provided in § 23-1331(4)."

[10] "[C]rime of violence" is defined as "assault with a dangerous weapon . . . or an attempt, solicitation, or conspiracy to commit any of the foregoing offenses." D.C. Code § 23-1331(4).

(quoting *Lucas v. United States*, 305 A.3d 774, 777 (D.C. 2023)). "We generally adhere to the canon of statutory construction under which 'each provision of the statute should be construed so as to give effect to all of the statute's provisions, not rendering any provision superfluous.'" *Id.* at 52 (quoting *Thomas v. D.C. Dep't of Emp. Servs.*, 547 A.2d 1034, 1037 (D.C. 1988)).

## 2. Analysis

Mr. Minor argues that because the D.C. Code's definition of "crime of violence" under Section 23-1331(4) specifically mentions the three inchoate offenses of "attempt," "solicitation," and "conspiracy," but does not mention aiding-and-abetting, that the intention of the legislature was to exclude aiding-and-abetting as a "crime of violence." If aiding-and-abetting an assault is *not* a crime of violence, he argues, then it cannot serve as the predicate for Mr. Minor's PFCV conviction, and the instruction stating otherwise gave the jury leave to convict Mr. Minor on a legally incorrect theory. He also asserts that the "aiding-and-abetting path" was an "easier" route for the jury to take because there was relatively little evidence of a conspiracy between Mr. Minor and Mr. Blakey and so there is a reasonable probability that the jury relied on the improper accomplice theory in rendering its guilty verdict.

Under D.C. Code § 22-1805: "In prosecutions for any criminal offense all persons advising, inciting, or conniving at the offense, or *aiding or abetting the principal offender*, shall be charged as principals and not as accessories . . . ." (italics added). Notably, this statute, originally enacted in 1901, predates both the enactment of the "crime of violence" definition in D.C. Code § 23-1331(4) and the precursor statute to the current PFCV provision in Section 22-4504 by some decades. *See* An Act to establish a code of law for the District of Columbia, 31 Stat. 1189, 1337, ch. 854 § 908 (1901) ("Persons advising, inciting, or conniving at criminal offense to be charged as principals"); Omnibus Public Safety Amendment Act of 2006, D.C. Law 16-306 (Act 16-482), §§ 223, 224 (2007) (enacting cross-reference to § 23-1331(4)); Act of July 8, 1932, 47 Stat. 650, 651, ch. 465, §§ 1, 2 (1932) (enacting precursor to current PFCV provision). Given that the District's general accessory liability statute has been in effect for 125 years, and is presumed to be known to the legislature, the exclusion of accessory liability cannot be presumed to occur by implication. *See Miles v. Apex Marine Corp.*, 498 U.S. 19, 32 (1990) ("We assume that Congress is aware of existing law when it passes legislation."); *See Off. of Workers' Comp. Programs v. Perini N. River Assocs.*, 459 U.S. 297, 319-20 (1983) ("We may presume 'that our elected representatives, like other citizens, know the law . . . .'" (citation omitted)); *Blitz v. Donovan*, 740 F.2d 1241, 1245 (D.C. Cir. 1984) ("Congress is deemed to know the . . . judicial gloss given to certain language and

thus adopts the existing interpretation unless it affirmatively acts to change the meaning." (alteration in original) (quoting *Fl. Nat'l Guard v. Fed. Lab. Rels. Auth.*, 699 F.2d 1082, 1087 (11th Cir.), *cert. denied*, 464 U.S. 1007 (1983))).

Because Mr. Minor is unable to meet the first prong of the plain error test by demonstrating the existence of an error made by the trial court, we do not need to reach the remaining three prongs. *Comford*, 947 A.2d at 1189-90.

## III. Conclusion

For the reasons set forth above, the judgments of the Superior Court are affirmed.

*So ordered.*